931 So.2d 807 (2006)
Ken E. LOTT, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-1814.
Supreme Court of Florida.
April 13, 2006.
Rehearing Denied June 2, 2006.
*809 Frank J. Bankowitz, P.A., Orlando, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Ken E. Lott, a prisoner under sentence of death, appeals the circuit court's orders denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and denying his motion for DNA testing under Florida Rule of Criminal Procedure 3.853. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. As to both motions, we affirm the denial of relief.

I. FACTS AND PROCEDURAL HISTORY
Lott was convicted of first-degree murder and sentenced to death for killing Rose Conners in March 1994. We affirmed his conviction and sentence on direct appeal. See Lott v. State, 695 So.2d 1239 (Fla.), cert. denied, 522 U.S. 986, 118 S.Ct. 452, 139 L.Ed.2d 387 (1997). He then filed a motion for postconviction relief under rule 3.850, which the circuit court summarily denied. After holding oral argument, we remanded for an evidentiary hearing "on all issues raised on appeal." See Lott v. State, 839 So.2d 698 (Fla.2003) (table). On remand, the circuit court again denied relief. Lott now returns to this Court.
The facts of the murder were as follows. On the morning of March 28, 1994, Rose Conners was found lying dead in her master bedroom. Her throat had been slashed, her larynx fractured, and her head struck with a blunt object. She had been stabbed once in the back. There were duct-tape lines on her legs, arms, and face, indicating she had been bound and gagged before being killed. Bruises on her arms matched the imprint of pliers found at the scene. She also had bruises on her thighs, abrasions on her elbows and knees, a broken fingernail, and a defensive wound on her thumb. Her panties were found, torn and soiled, in a different bedroom. Fecal material was also found on *810 her foot and smeared on the floor. According to the medical examiner, Conners had been rendered unconscious by the combination of the blow to her head and the pressure to her neck. But the cause of death was the slashing of her neck, which partially severed her jugular vein. The medical examiner estimated that she died between 2 p.m. on Saturday, March 26, 1994, and 5 p.m. the next day.
While going through the victim's possessions, her sister noticed that a diamond tennis bracelet was missing. In April 1994, Lott offered to sell a diamond tennis bracelet and a gold ring to his friend, David Pratt, who declined the offer. Shortly thereafter, Lott told a longtime acquaintance, Robert Whitman, how he obtained the jewelry. Needing money to buy drugs, Lott and a man named Ray Fuller had decided to rob Conners, a former customer of Lott's lawn-care business. They went to her house in the morning. The plan was for Fuller, who did not know the victim, to tie, gag, and blindfold her, while Lott waited outside. But Conners escaped from the house and saw Lott hiding in the bushes. He caught her and brought her back inside, where he beat her and then tied her up. Lott could not find any money inside the houseonly the jewelry. Lott told Whitman that Conners had begged for mercy and offered to transfer title to her car and to empty her bank account. But Lott decided to kill her because she knew him and would send him to prison. He then cut her throat with a boning knife. After dark, he returned to clean up the crime scene.
Whitman reported this confession to the Orange County sheriff's department, which devised a plan to have Whitman purchase the stolen jewelry from Lott. In a recorded telephone conversation, Whitman and Lott discussed a price for the jewelry and set a meeting time. Lott arrived early, and the police were still in the process of installing eavesdropping equipment in Whitman's home. Whitman told Lott they were TV repairmen and asked him to come back in an hour or two. Lott returned as requested, but refused to enter the home. As a result, their meeting was not recorded. According to Whitman, however, Lott gave him the stolen jewelry for $600. When Lott drove away, deputies pursued and arrested him. They found $600 under his vehicle.
At trial, the State introduced other evidence connecting Lott to the crime. First, according to records and photographs from the automatic teller machine at the victim's bank, a man fitting Lott's description and driving a truck like Lott's withdrew money from the victim's account at 9:23 p.m. on Sunday, March 27, 1994only hours after the time frame of the murder. Second, coworkers of Lott's wife Tammy testified that she wore the victim's jewelry after the murder. Whitman also saw Tammy wearing the jewelry.
Finally, the State introduced forensic evidence from the crime scene. Three palm prints found in the victim's home matched Lott's palm print with a "large amount of detail." One was on the glass around the front door. Another was on the doorjamb of the second bedroom, where the victim's torn and soiled panties were discovered. The third was on the front edge of a sink in the master bathroom, near the victim's body. Three footwear impressions were also found on the kitchen floor that, according to an expert witness, could only have come from the same mold as Lott's size 9 Spalding tennis shoes. Additionally, fiber found during the sweep of the victim's home was consistent with a Hanes T-shirt collected from Lott's house.
Facing this evidence, Lott focused his defense on the theory that Whitman framed him. Whitman admitted to having *811 prior convictions and to supplying Lott with drugs. He also acknowledged that, twenty-three years earlier, Lott had informed the police about their mutual involvement in a theft, resulting in minor punishment for Whitman. The defense argued that Whitman concocted Lott's confession as a means of getting revenge, and that he may have been the actual murderer. Lott himself did not testify at trial, nor did the defense make a serious attempt to prove an alibi. The only evidence suggesting an alibi came from Lott's mother, who testified that Lott came to her house on Saturday afternoon and that she called him on Sunday morning. She also testified, as did Lott's aunt, that Whitman told them just before Lott's arrest that he had been waiting twenty years to get even with Lott.
After the jury left to consider the evidence, the trial judge asked Lott about his counsel's performance. Lott told the judge he was satisfied with their efforts, and that they mutually agreed he would not testify at the guilt phase. Upon returning, the jury found Lott guilty of first-degree murder.
At the penalty phase, clinical psychologist Dr. Henry L. Dee testified that Lott has brain damage, which he attributed to a motorcycle accident that Lott suffered at age sixteen. Dr. Dee also testified that Lott might have psychopathy. He noted that Lott had been abused as a child, had abused drugs up to the time of the crime, and had a long history of criminal behavior. Lott's mother also testified. She recalled that Lott suffered head injuries in a car accident at eighteen months old, as well as in the later motorcycle accident. Other witnesses characterized Lott as honest and nonviolent. Nevertheless, the jury unanimously recommended a death sentence.
At a subsequent Spencer[1] hearing, Lott took the stand. He testified that Conners was a customer of his lawn-care business from 1992 until the end of 1993. He had entered her house "on several occasions." Asked to explain his palm print in the victim's master bathroom, he testified that he visited her home in February 1994 (the month before the murder) after a chance encounter at a barbecue restaurant. Conners could not get her car to start, so Lott drove her home to get jumper cables. While there, Conners asked Lott to look at her master bathroom to discuss how to decorate a garden window with plants. During their discussion, Lott "was leaning with my hands behind my back against the [sink counter]." Asked to explain his palm print in the other bedroom, Lott stated: "I know I haven't been in that room." Lott admitted to using the victim's ATM card shortly after the murder, but claimed he obtained it from Whitman, whom he also encountered by chance. Whitman's vehicle had broken down, just as Conners's had, and Lott had stopped to help him. Whitman showed Lott a stolen ATM card and asked Lott to withdraw money for him. According to Lott, "at the time I used it, I didn't know it was [the victim's]." Lott claimed that Whitman also asked him to have his wife show off Conners's jewelry at work, and that he "didn't even know then that it was stolen jewelry." As for his attempt to sell the jewelry to Whitman, Lott testified that Whitman asked him to pretend he owned the jewelry in order to deceive Mexican drug dealers who were listening to their conversation.
The trial court found six aggravators: (1) Lott had prior violent felony convictions; (2) the murder was committed during a burglary or kidnapping or both; (3) the murder was committed to avoid arrest; *812 (4) the murder was committed for pecuniary gain; (5) the murder was especially heinous, atrocious or cruel (HAC); and (6) the murder was committed in a cold, calculated, and premeditated manner (CCP). The trial court also found six mitigators. Three were given considerable weight: (1) Lott was under extreme mental or emotional disturbance; (2) Lott's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired; and (3) Lott suffered from drug addiction. The court found other mitigators as well, but gave them less weight: Lott's performance of volunteer work (slight weight); his helpfulness to his parents (some weight); and his steady employment (some weight). Finding that the aggravators outweighed the mitigators, the trial court followed the jury's recommendation and sentenced Lott to death.
On direct appeal, we rejected all of Lott's arguments, finding the evidence "more than sufficient to sustain Lott's conviction of first-degree murder," Lott, 695 So.2d at 1242, and to sustain the death penalty given "the physical torture and emotional trauma [the victim] suffered during the time leading up to her death," among other factors. Id. at 1244.[2]
Lott filed an amended postconviction motion in February 2001. He alleged, among other things, that his trial counsel was ineffective in interfering with his right to testify, failing to investigate his alibi, failing to challenge the State's forensic evidence, and providing insufficient background information to Dr. Dee. The circuit court summarily denied relief. But after holding oral argument, we remanded the case for an evidentiary hearing on all issues. Lott, 839 So.2d at 698.
After the remand, Lott filed a motion for DNA testing under rule 3.853. He claimed that genetic material from the crime scene might show that another person committed the crime, or that the crime did not involve heinous, atrocious, or cruel conduct. Id. The circuit court denied the motion. It noted that "[a]t trial, the prosecutor clearly conceded that another person might have been involved in the murder." Additionally, the court noted that "the evidence was clear that the victim was tortured in some way." Thus, it found "no reasonable probability that any of the results [of DNA testing] would tend to exonerate him or mitigate his sentence." Although Lott could have appealed the DNA ruling immediately under rule 3.853, he did not.

II. EVIDENTIARY HEARING
The circuit court conducted a three-day evidentiary hearing in July 2004. At the hearing, Lott testified again about his business relationship with the victim. He reiterated that, as part of his lawn-care *813 job, he entered her house "every ninety days" to change decorative plants. He also repeated the story that he told at the Spencer hearing about his chance encounter with the victim shortly before the murder, during which they spent "ten, fifteen minutes possibly" in her master bathroom "discussing about the plants and stuff going in there." Some parts of this story differed from what Lott said at the Spencer hearing, most notably the specific place and time of the encounter.
Lott also gave an extensive alibi for the weekend of the murder: On Saturday morning he went with his wife, Tammy, to his boss's house and then to his parents' house, where he spent much of the afternoon. His parents were planning to drive to an RV park in St. Augustine, so he agreed to watch their puppies. A picture of him with the puppies, purportedly from that Saturday, was introduced as evidence. That night, Lott went to Blockbuster to rent videos, which he returned early the next morning. Then he went for a drive with Tammy that lasted most of Sunday. They drove first to Palatka and then toward Starke so that Lott could show his wife a prison where he was once incarcerated. Arriving around noon, they circled the parking lot. While driving out of Starke, they stopped at a convenience store and then a fruit stand. Lott recalled speaking with the stand's owner about fishing and Lake Okeechobee. Then they drove to St. Augustine to make sure that Lott's parents made it to the RV park. He saw their RV, but did not stop to say hello because "they'd have had me the rest of the day." Next they stopped to eat at a Sonny's restaurant in St. Augustine at about 2:30 p.m., paying in cash. Finally, they took the coastline down to Daytona, getting there at 4:30 p.m., and drove home to DeLand. Lott then left home again and came upon Whitman, whose truck had broken down. Lott offered to help. As explained at the Spencer hearing, Whitman showed Lott the victim's ATM card and asked him to withdraw some money. Contrary to his testimony at the Spencer hearing, however, Lott admitted that he knew the card belonged to Conners. Being high on cocaine, he complied with Whitman's request. The two men were alone together from dusk until 11:00 p.m.
From the beginning of the case, Lott told his attorneys that he wanted to testify about this alibi. But his lead attorney, Joel Spector, expressed concern about Lott's prior violent felony convictions and bad temper. He feared that allowing the prosecutor to cross-examine Lott "would be like, quote, poking a dog in a cage." The second-chair attorney, Scott Richardson, agreed with that assessment, but nevertheless felt that Lott "needed to testify" to rebut the evidence against him.
Toward the end of trial, Spector enlisted an experienced criminal defense attorney, Raymond Goodman, to assist him in persuading Lott that testifying would be more harmful than beneficial. Apparently, Lott was sitting in the jury box when the discussion occurred. Lott recalled being "really confused" and "nervous," but acknowledged that he ultimately agreed not to testify because he "was trying to pacify" Spector, who was "sweating bullets for some reason." According to Richardson, who witnessed the conversation, Spector and Goodman "were browbeating" Lott into not testifying. But Spector believed that Lott voluntarily took his advice and "guarantee[d] that if [Lott] insisted after that that he wanted to testify, then I would have put him on." Even Richardson acknowledged that Lott "finally said, okay, I won't testify," which is why Richardson did not bring the issue to the court's attention.
Lott also accused his attorneys of failing to locate witnesses to corroborate his alibi. *814 Six months after taking the case, Spector had assigned an investigator "to follow up all the leads relating to the alibi." The investigator spent nine hours on a weekday attempting to locate witnesses from the fruit stand near Starke and from the Sonny's restaurant in St. Augustine. Upon returning, he told Spector that "basically, in a nutshell, he couldn't find anybody that remembered seeing Kenny Lott in that area that he visited during the time or at any time, really." Together, they decided it would be futile to continue searching. To make matters worse, Lott's wife Tammy, the central alibi witness, "contacted [Spector] shortly before the trial and indicated that she didn't want to testify." While not directly refuting the alibi, she told Spector, "I'm not going to lie for Kenny anymore and I'm not going to testify." At that point, Spector decided that the alibi had "fallen pretty flat."
Richardson, the second-chair attorney, felt that a sufficient investigation of Lott's alibi was never conducted. He suspected that the investigator was "padding his time," and testified that "it didn't seem like the enthusiasm was there as far as tracking down the witnesses." Spector denied this characterization, testifying that they "followed up every possible lead that we had in every direction" and that "if [the investigator] came back and told me, I couldn't find a fruit stand or I couldn't find a waitress, that was good enough for me."
The postconviction investigator did manage to locate one new witness: a man named Elmer Jones, who used to operate a fruit stand near Starke. Jones testified at the evidentiary hearing. He recalled speaking with Lott about fishing and Lake Okeechobee at his stand, which was only open on Saturdays and Sundays. He believed the conversation happened on an afternoon. But he could not narrow down the date. He said it could have occurred anywhere from the "early eighties up until 1996." He recalled that Lott "had been by my place more than once" and would "come by whenever I would go out to bring the trailer in." Lott's mother also recalled that her son used to visit the fruit stand to buy relish "whenever he had a chance to go get it." Lott said his mother was thinking of another stand that he visited regularly to buy relish. He claimed to have visited Jones's stand only once. But his mother said, "I don't think I have the two of them confused."
Dr. Dee, the clinical psychologist who testified for Lott at the penalty phase, did so again at the evidentiary hearing. He reexamined Lott in 2000 after receiving additional background information. From those materials he learned that Lott's car accident as an infant was more extensive than previously realized. As he explained, "I was told about it [before the penalty phase], but never got records about it or told about the extent of it." He testified that the severity of that accident "sort of ties things together much better" by explaining Lott's antisocial behavior before his motorcycle accident at age sixteen. But Dr. Dee denied that his overall testimony at the penalty phase would have been much different: "I don't know that [the new information] would change my diagnosis or opinion, but it certainly bolstered it."
After the evidentiary hearing, the circuit court denied Lott's motion for postconviction relief, concluding that Lott "has proven neither deficient performance nor prejudice" on any of the issues. Lott now appeals the circuit court's ruling on his 3.850 motion and also appeals its earlier ruling on his motion for DNA testing. Each motion will be addressed in turn.

III. ANALYSIS OF 3.850 CLAIMS
Lott alleges that his trial counsel was ineffective in (A) investigating his alibi, *815 (B) preparing the clinical psychologist for the penalty phase, (C) challenging the forensic evidence, (D) investigating how Lott obtained the victim's PIN number, and (E) interfering with his right to testify. He also alleges (F) cumulative error. We address each of these claims separately below. The standard that governs them is the two-pronged test from Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): first, Lott must show that his counsel's performance was deficienti.e., unreasonable under prevailing professional norms; and second, he must show that the deficiency prejudiced the defensei.e., that it undermines confidence in the outcome of the trial by creating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Valle v. State, 778 So.2d 960, 965-66 (Fla.2001) (quoting Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). In evaluating the deficiency and prejudice prongs, we must conduct "an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings" if they are supported by competent, substantial evidence. State v. Riechmann, 777 So.2d 342, 350 (Fla.2000).

A. Alibi Investigation
The first issue is whether Lott's trial counsel was ineffective in failing to investigate his alibi. The circuit court concluded that the alibi investigation was neither deficient nor prejudicial. We need not address the deficiency prong, however, because Lott clearly has not shown prejudice. See, e.g., Pietri v. State, 885 So.2d 245, 256 (Fla.2004) (stating that "a court considering a claim of ineffectiveness of counsel `need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied'") (quoting Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla. 1986)).
At the evidentiary hearing, Lott presented only one new alibi witness, Elmer Jones. Lott claimed that he stopped at Jones's fruit stand near Starke on Sunday afternoon, during the time frame of the murder, and spoke with him about fishing and Lake Okeechobee. Jones did recall speaking with Lott about those subjects. He thought the conversation must have occurred on a weekend afternoon, because his stand was only open on weekends. But he could not pinpoint the date of the conversation. It could have taken place anywhere from the "early eighties up until 1996." Moreover, Jones testified that Lott "had been by my place more than once" and would "come by whenever I would go out to bring the trailer in," making it even more difficult to verify whether the conversation occurred on the weekend of the murder. Lott's mother also thought that her son visited Jones's stand multiple times, which Lott denied.
Our confidence in the verdict is not undermined by Jones's vague testimony. As the circuit court emphasized in finding no prejudice, Jones "could not even narrow the date down to the year in which he believed this possible encounter took place. He could in no way place Mr. Lott in North Florida at the time of the murder." Without corroboration of a specific date and time, Jones's testimony would have been of minimal value as alibi evidence. Moreover, even if the jury believed that Lott did speak with Jones on the Sunday afternoon in question, it still would have left plenty of room in the twenty-seven hour timeline for Lott to have committed the murder. Given that Lott's palm prints were found inside the victim's home, along with shoe impressions consistent with his size 9 Spalding shoes and fibers consistent with his Hanes T-shirt, and given that he *816 used the victim's ATM card shortly after the murder and then tried to sell her jewelry, we remain confident in the verdict.

B. Preparing the Clinical Psychologist
Next, Lott alleges that his trial counsel was ineffective in providing background information to Dr. Dee, the clinical psychologist who examined Lott and testified during the penalty phase. The circuit court rejected this claim without discussion, because "postconviction counsel agreed that the evidence presented at the hearing failed to support the requested relief." The record reveals that Lott did, in fact, abandon this claim. He cannot revive it on appeal. Cf. Anderson v. State, 822 So.2d 1261, 1266 (Fla.2002) (refusing to review claims under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the defendant "intentionally abandoned"). Even if Lott had preserved the claim, however, we would reject it for lack of prejudice. Dr. Dee admitted that the new information he received from the postconviction investigator would have "bolstered" his testimony, but would not necessarily have "change[d] my diagnosis or opinion." Thus, our confidence in Lott's sentence is not undermined.

C. Challenging the State's Forensic Evidence
Lott also makes a conclusory allegation that his trial counsel was ineffective in failing to investigate and rebut the forensic evidence. The circuit court rejected this claim, finding neither deficiency nor prejudice. On the deficiency prong, the court noted that counsel "attacked the evidence on cross-examination by eliciting admissions that: (1) the fibers would match any Hanes brand T-shirt; and (2) the shoe print was not unique to Mr. Lott's shoe and would match any same-sized Spalding tennis shoe manufactured using the same mold." On the prejudice prong, the court noted that at the evidentiary hearing Lott "did not demonstrate anything else that trial counsel could or should have done to cast doubt on the relevance of the fiber and shoe print evidence." We agree on both points. Moreover, we have repeatedly held that "conclusory allegations are insufficient to warrant relief" on an ineffective assistance claim. Wright v. State, 857 So.2d 861, 877 (Fla.2003) (citing Kennedy v. State, 547 So.2d 912, 913 (Fla. 1989)). Accordingly, we reject this conclusory claim.

D. Investigating the PIN Number
Lott alleges that his trial counsel was ineffective in failing to investigate whether the victim's PIN number and ATM card came in separate mailings. Lott presented evidence that the victim's bank has a policy of always mailing the PIN number separately. According to Lott, this evidence would have helped rebut the State's argument that the victim was tortured into revealing her PIN number, which he contends was the basis for the HAC aggravator. The State concedes that Lott's attorney did not investigate this matter, but argues that whether the PIN number came in a separate mailing is irrelevant. The circuit court agreed with the State, explaining that it could "not see how it would tend to prove or disprove any material fact at trial had the defense proven that the victim's PIN number was mailed to her in a separate envelope from her credit card, which Mr. Lott used to withdraw money following the murder."
We agree that Lott's claim lacks merit. Evidence that the PIN number came in a separate envelope from the ATM card would seem, if anything, to increase the odds that Lottwho obviously did have the ATM carddid not have the PIN *817 number in writing, and thus might have tortured the victim into revealing it. Moreover, the trial court made clear in its sentencing order that the HAC aggravator was not dependent on whether Lott tortured the victim to get her PIN number:
Based on the evidence, this crime occurred over a period of time. From the minute the Defendant entered the home until the victim was choked into unconsciousness (hopefully), she suffered unspeakable humiliation, terror, and pain. She was so afraid that she defecated on herself, her panties with feces on them were removed in one bedroom, she was completely nude and died in the master bedroom. Her mouth, wrists, and ankles were taped making her totally defenseless. Plier marks were on her arm. The State suggests the pliers were used to get her to tell her attacker(s) her ATM number. That is a reasonable possibility and perhaps the least onerous. There is no way of knowing how long this tortuous assault lasted, but common sense dictates it could not have been brief. Once the Defendant got everything he needed from Rose Conners, he deliberately slashed her throat, and to be sure she was dead, he stabbed her in the back. These acts were definitely conscienceless, pitiless, and unnecessarily tortuous.
The trial court offered a litany of reasons why the crime was heinous, atrocious, or cruelmany of which had nothing to do with the PIN number. In fact, the trial court characterized the "possibility" that Lott tortured the victim to get her PIN number as "perhaps the least onerous" explanation of the crime, presumably because the victim would have revealed the number immediately and thereby ended the torture. Thus, disproving that "possibility" would not have prevented the HAC aggravator from being found. Moreover, the trial court found five other aggravating factorsCCP, avoid-arrest, pecuniary gain, prior violent felonies, and murder committed during a burglary or kidnapping or bothand the jury unanimously recommended a death sentence. Our confidence in this sentence has not been undermined.

E. The Right to Testify
The next issue is whether Lott's trial counsel interfered with his right to testify. To prevail on this claim, Lott must satisfy the Strickland standard for ineffective assistance of counsel: first, he must prove deficient performance, and second, he must prove prejudice. See, e.g., Oisorio v. State, 676 So.2d 1363, 1364 (Fla. 1996) ("We find that a defendant claiming ineffective assistance of counsel based on counsel's interference with his right to testify must meet both prongs of Strickland. . . in order to obtain postconviction relief."). The circuit court found no deficiency. Although Lott "initially wanted to testify," the circuit court determined that he made a "voluntary decision, and a joint decision" with counsel not to do so. Because there is competent, substantial evidence to support this ruling, we must affirm.
The United States Supreme Court has made clear that a criminal defendant "has the ultimate authority to make certain fundamental decisions regarding the case," one of which is whether to "testify in his or her own behalf." Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (citing Wainwright v. Sykes, 433 U.S. 72, 93 n. 1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring)). The Court has located this right to testify in the Due Process Clause of the Fourteenth Amendment and the Compulsory Process Clause of the Sixth Amendment, see Rock v. Arkansas, 483 U.S. 44, 51-52, 107 S.Ct. 2704, 97 L.Ed.2d *818 37 (1987), and has also called it "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." Id. at 52, 107 S.Ct. 2704. Yet the Court has not specifically addressed what a defendant must do to waive the right.
We have addressed the waiver issue many times, beginning in the seminal case of Torres-Arboledo v. State, 524 So.2d 403 (Fla.1988). There, we acknowledged "a constitutional right to testify under the due process clause of the United States Constitution," but rejected the view that it "fall[s] within the category of fundamental rights which must be waived on the record by the defendant himself." Id. at 410-11. Rather, we held that "a trial court does not have an affirmative duty to make a record inquiry concerning a defendant's waiver of the right to testify." Id. at 411 n. 2. In dictum, however, we cautioned that to avoid postconviction disputes "it would be advisable for the trial court, immediately prior to the close of the defense's case, to make a record inquiry as to whether the defendant understands he has a right to testify and that it is his personal decision, after consultation with counsel, not to take the stand." Id.
Since Torres-Arboledo, "this Court has repeatedly refused to require an on-the-record waiver" of the right to testify. Brown v. State, 894 So.2d 137, 153 (Fla. 2004); see also Peterka v. State, 890 So.2d 219, 235 (Fla.2004), cert. denied, ___ U.S. ___, 125 S.Ct. 2911, 162 L.Ed.2d 301 (2005); Davis v. State, 875 So.2d 359, 368 (Fla.2003); Lawrence v. State, 831 So.2d 121, 132 (Fla.2002); Occhicone v. State, 570 So.2d 902, 905 (Fla.1990); Remeta v. State, 522 So.2d 825, 827 (Fla.1988). At the same time, we have demanded that the record at least "support a finding that such a waiver was knowingly, voluntarily, and intelligently made." State v. Lewis, 838 So.2d 1102, 1112 (Fla.2002) (quoting Deaton v. Dugger, 635 So.2d 4, 8 (Fla.1993)).
In most cases where we have considered an ineffective assistance claim based on interference with the right to testify, we have found competent, substantial evidence to support the trial court's finding that the defendant knowingly and voluntarily decided not to testify. See, e.g., Monlyn v. State, 894 So.2d 832, 838 (Fla. 2004) (holding that "[t]he trial court's finding, based on trial counsel's unswerving testimony, that counsel always advised clients of this right [to testify at the penalty phase] and that he did so in this case, is supported by competent, substantial evidence"); Brown, 894 So.2d at 153 (holding that "the court's discussion with Brown and his subsequent written waiver are more than sufficient"); Peterka, 890 So.2d at 235 (holding that, where defense counsel "advised Peterka not to testify because Peterka's version of events were being introduced by his videotaped statement," an ineffective assistance claim was "contrary to the evidence"); Lawrence, 831 So.2d at 131-32 (rejecting an ineffective assistance claim where counsel testified that "he had lengthy discussions with the Defendant concerning whether to testify" and "that the defendant agreed with his position that the Defendant should not testify in the guilt phase").
The case most similar to this one is Shere v. State, 742 So.2d 215 (Fla.1999), where we also rejected an ineffective assistance claim based on interference with the right to testify. In Shere, defense counsel worried that the defendant would not be credible because he kept changing his story. They repeatedly advised him not to testify, and their investigator and the Chief Assistant Public Defender gave similar advice. In the end, however, "they allowed the defendant to make the final decision on whether he should testify in *819 the guilt stage." Id. at 222. According to them, "[h]e agreed that he would not." Id. Yet a second-chair attorney testified that the defendant "did not understand the decision of whether or not to testify." Id. The defendant claimed that counsel "pressured him into deciding not to testify." Id. at 221. Nevertheless, we upheld the trial court's conclusion that the lead attorney's "advice was a reasonable, tactical decision that was in the realm of counsel's professional judgmentnot ineffective assistance of counsel." Id. at 222; see also United States v. Teague, 953 F.2d 1525, 1535 (11th Cir.1992) (en banc) (rejecting a claim of interference with the right to testify where defense counsel "advised [the defendant] that it would be unwise and unnecessary for him to testify," and ultimately "believed that [he] had assented or acceded to her recommendation").
We reach the same conclusion here. Notwithstanding Lott's initial desire to testify, both his attorneys stated that he ultimately agreed not to do so. Lott confirmed as much during a colloquy with the trial judge at the end of the guilt phase:
COURT: Now that all the jurors are out of the room, Mr. Lott, are you satisfied with the representation of your two lawyers?
LOTT: Yes, ma'am.
....
COURT: Did the attorneys do everything that you anticipated they would do?
LOTT: Yes, ma'am.
COURT: And was it a joint choice by all three of you that you would not testify in the trial?

LOTT: Yes, ma'am.

COURT: Okay. Is there anything that they did that you didn't want them to do?
LOTT: No.
COURT: So you're satisfied with everything they've done?
LOTT: Yes, ma'am.
(Emphasis added).[3] In light of this competent, substantial evidence, we must defer to the circuit court's factual finding that Lott voluntarily agreed with counsel's recommendation not to take the stand.
A separate question is whether Spector's advice to Lott, even if voluntarily followed, was nevertheless deficient because no reasonable attorney would have discouraged Lott from testifying. As the circuit court explained below, there were "many identifiable risks of placing Mr. Lott on the witness stand." Spector identified three in particular: (1) there were no witnesses able to corroborate Lott's alibi, because his wife Tammy did not want to "lie for Kenny anymore" and because the investigator could not locate any witnesses in north Florida; (2) Lott has a bad temper; and (3) Lott has a significant criminal history, including three armed robbery convictions and one attempted escape conviction. In retrospect, perhaps Lott's testimony would have been worth these risks. But we have explained that "[t]o fairly assess counsel's performance, the reviewing court must make every effort to eliminate the `distorting effects of hindsight' and to evaluate the conduct from counsel's perspective at the time." Elledge v. State, 911 So.2d 57, 67 (Fla.2005) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052), cert. denied, ___ U.S. ___, 126 S.Ct. 1173, 163 L.Ed.2d 1141 (2006). At the time of trial, Lott's counsel did consider the possibility of advising Lott to testify, but gave the opposite recommendation *820 due to reasonable, strategic considerations. Thus, his performance cannot be considered deficient. See, e.g., Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000) (explaining that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct").

F. Cumulative Error
Finally, Lott alleges cumulative error. Even when considered cumulatively, however, Lott's ineffective assistance claims do not undermine our confidence in the verdict or sentence. We therefore reject this claim as well.

IV. ANALYSIS OF 3.853 CLAIM
After we remanded for an evidentiary hearing, Lott filed a motion for DNA testing under rule 3.853 of the Florida Rules of Criminal Procedure. The circuit court denied the motion on December 4, 2003. Under the rule, "[a]n appeal may be taken by any adversely affected party within 30 days from the date the order on the motion is rendered." Fla. R.Crim. P. 3.853(f). Lott, however, waited until the circuit court denied his 3.850 motion and then appealed both rulings together on September 2, 2004. The State contends that Lott's appeal of the DNA ruling is untimely. We decline to construe rule 3.853 so strictly. When a prisoner has a pending motion for postconviction relief under rules 3.850 or 3.851, and in that context moves for DNA testing, the most efficient use of judicial resources will normally be to appeal all the circuit court's rulings upon appeal from the final order determining the postconviction motion. In analogous circumstances, the rules allow parties to raise issues addressing nonfinal orders upon appeal of the final order. Cf. Fla. R.App. P. 9.110(k) (stating that "partial final judgments are reviewable either on appeal from the partial final judgment or on appeal from the final judgment in the entire case"); Fla. R.App. P. 9.130(g) (stating that the rule allowing review of certain non-final orders "shall not preclude initial review of a non-final order on appeal from the final order in the cause"). To promote judicial efficiency, we grant Lott and others in his position the same choice.
On the merits, we agree with the circuit court that Lott is not entitled to DNA testing. Under rule 3.853, the defendant must begin by "show[ing] that physical evidence that may contain DNA still exists." Fla. R.Crim. P. 3.853(c)(5)(A). Then, as we have explained, "[i]t is the defendant's burden to explain, with reference to specific facts about the crime and the items requested to be tested, how the DNA testing will exonerate the defendant of the crime or will mitigate the defendant's sentence." Robinson v. State, 865 So.2d 1259, 1265 (Fla.), cert. denied, 540 U.S. 1171 (2004). Lott has not made a sufficient showing. He requested DNA testing of (1) hairs found in the victim's shower drain and bed pillow; (2) the victim's fingernails; (3) the pliers found at the scene; and (4) the sheets, pillows, panties, vaginal and anal swabs of the victim, and fecal matter, primarily in search of sperm. But nothing in the record suggests that the pliers, which were dusted for fingerprints, or the victim's fingernails, which were scraped and sent for analysis, contain any genetic material that could be submitted for testing. Lott is merely speculating about these items. Additionally, as Lott conceded in his motion, previous tests did not indicate the presence of sperm at the crime scene. Lott is not entitled to DNA testing to confirm its absence. As for the hairs found in the victim's shower drain and on her pillow, Lott has not offered any reason to suspect they are specifically connected to the murder, as opposed to being hairs left behind by normal guests, which any house would *821 have. He certainly has not shown "a reasonable probability that [he] would have been acquitted or would have received a lesser sentence" if they had been tested. Fla. R.Crim. P. 3.853(c)(5)(C).
We have repeatedly cautioned that "[r]ule 3.853 is not intended to be a fishing expedition." Cole v. State, 895 So.2d 398, 403 (Fla.2004) (quoting Hitchcock v. State, 866 So.2d 23, 27 (Fla.2004)). For example, in Hitchcock, we affirmed the denial of a rule 3.853 motion where "in [the defendant's] motion, only a general reference and identification of the type of item was given, without any other relevant information." 866 So.2d at 27. The defendant in that case merely listed a number of items of clothing, but did not indicate "whether those clothes belonged to the victim, the defendant, or [another person] ... or whether there is any indication from evidence logs, crime lab reports, or trial testimony that any bodily fluids may exist on these items." Id. at 27 n. 2. In this case, too, the defendant has embarked on a fishing expedition for genetic material whose existence and potential relevance is pure conjecture. We therefore affirm the circuit court's ruling that Lott cannot obtain DNA testing based on the speculative allegations in his motion.

V. CONCLUSION
For the reasons explained above, we affirm the denial of Lott's postconviction motion under rule 3.850. We also affirm the denial of his motion for DNA testing under rule 3.853.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] The guilt phase issues on direct appeal were (1) the sufficiency of the evidence; (2) whether Whitman's brother should have been permitted to testify regarding Whitman's reputation for truthfulness; (3) whether Lott's mother should have been permitted to testify that Lott told her he had done lawn work for the victim; (4) the admission of crime scene photographs; and (5) whether the trial court erred in denying Lott's motion for sanctions for violations of the rule of witness sequestration. Lott, 695 So.2d at 1242-43. The penalty phase issues were (1) the applicability of the HAC aggravator; (2) the applicability of the CCP aggravator; (3) whether the trial court erred in admitting letters from the Department of Corrections regarding a prior conviction; (4) whether the trial court improperly admitted victim impact evidence; (5) whether the trial court erred in allowing certain cross-examination of Lott's stepfather; (6) the constitutionality of section 921.141, Florida Statutes (1993); and (7) the proportionality of the death sentence. Lott, 695 So.2d at 1244-45.
[3] Lott criticizes the timing of this colloquy, claiming it happened too late in the trial. But we have never required that defendants make any waiver on the record, much less that they make it before a particular point in the proceedings.