[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 25, 2010
JOHN LEY
ACTING CLERK

No. 09-14196
_____

D. C. Docket No. 06-00778-CV-ACC-GJK

KEN E. LOTT,

Petitioner-Appellant,

versus

ATTORNEY GENERAL, STATE OF FLORIDA,
SECRETARY, DEPARTMENT OF CORRECTIONS,
MILTON HICKS,
Warden, Union Correctional
Institution, Raiford Florida,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

**(January 25, 2010)**

Before DUBINA, Chief Judge, HULL and MARCUS, Circuit Judges.

HULL, Circuit Judge:

Ken E. Lott, a death-sentenced Florida prisoner, seeks a certificate of appealability ("COA") to appeal the district court's denial of his 28 U.S.C. § 2254 federal habeas corpus petition. We deny Lott's COA application because he fails to make a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).

## I. BACKGROUND

In March 1994, Lott brutally murdered Rose Conners. The Florida Supreme Court summarized the facts of the crime:

> On the morning of March 28, 1994, Rose Conners was found lying dead in her master bedroom. Her throat had been slashed, her larynx fractured, and her head struck with a blunt object. She had been stabbed once in the back. There were duct-tape lines on her legs, arms, and face, indicating she had been bound and gagged before being killed. Bruises on her arms matched the imprint of pliers found at the scene. She also had bruises on her thighs, abrasions on her elbows and knees, a broken fingernail, and a defensive wound on her thumb. Her panties were found, torn and soiled, in a different bedroom. Fecal material was also found on her foot and smeared on the floor. According to the medical examiner, Conners had been rendered unconscious by the combination of the blow to her head and the pressure to her neck. But the cause of death was the slashing of her neck, which partially severed her jugular vein. The medical examiner estimated that she died between 2 p.m. on Saturday, March 26, 1994, and 5 p.m. the next day.

Lott v. State, 931 So. 2d 807, 809-10 (Fla. 2006) ("Lott II"). Certain items of jewelry, including a diamond tennis bracelet, were missing from Conners's home.

2

Id. at 810.

In April 1994, Lott tried to sell the diamond tennis bracelet and a gold ring. In doing so, Lott told his longtime acquaintance Robert Whitman how he obtained the jewelry. Lott told Whitman how he and a man named Ray Fuller decided to rob Conners, whom Lott knew because he had done lawn-care work for Conners, to get money to buy drugs:

> They went to her house in the morning. The plan was for Fuller, who did not know the victim, to tie, gag, and blindfold her, while Lott waited outside. But Conners escaped from the house and saw Lott hiding in the bushes. [Lott] caught her and brought her back inside, where he beat her and then tied her up. Lott could not find any money inside the house–only the jewelry. Lott told Whitman that Conners had begged for mercy and offered to transfer title to her car and to empty her bank account. But Lott decided to kill her because she knew him and would send him to prison. [Lott] then cut her throat with a boning knife. After dark, [Lott] returned to clean up the crime scene.

Id.

Whitman told the police, who arranged for Whitman to buy the stolen jewelry from Lott while the police recorded the transaction. The police recorded a telephone conversation in which Lott and Whitman discussed a price for the jewelry and set a meeting time, but the meeting itself was not recorded because Lott refused to enter Whitman's home, where the recording equipment was located. According to Whitman, Lott sold him the jewelry for $600. Police

3

officers arrested Lott after he drove away, and they found $600 under his truck.

At trial, the State introduced, inter alia: (1) Whitman's testimony; (2) records and photographs from Conners's bank showing that "a man fitting Lott's description and driving a truck like Lott's withdrew money from [Conners's] account at 9:23 p.m. on Sunday, March 27, 1994"; (3) testimony from co-workers of Lott's wife Tammy, that Tammy wore Conners's jewelry after the murder; (4) three palm prints (that matched Lott's with a "large amount of detail") were found in Conners's house near the front door, on a sink in the master bathroom, and on the doorjamb of the second bedroom; (5) three shoe impressions from Conners's kitchen floor "that, according to an expert witness, could only have come from the same mold as Lott's size 9 Spalding tennis shoes"; and (6) fiber from Conners's house that was "consistent with a Hanes T-shirt collected from Lott's house." Id.

Lott's defense focused on the theory that Whitman framed him, and that Whitman himself may have murdered Conners. Whitman admitted (1) he had prior convictions, (2) he supplied Lott with drugs, and (3) that twenty-three years before, "Lott had informed the police about their mutual involvement in a theft, resulting in minor punishment for Whitman." Id. at 810-11. Lott's mother and aunt testified that Whitman told them, before Lott was arrested, that Whitman "had been waiting twenty years to get even with Lott." Id. at 811.

4

Lott did not testify. Nor did the defense "make a serious attempt to prove an alibi." Id. The only alibi-related evidence was Lott's mother's testimony that Lott came to her home on Saturday afternoon and that she called Lott on Sunday morning. Id.

The jury found Lott guilty of first-degree murder and, after a penalty-phase hearing, recommended 12-0 that Lott receive the death penalty. The state trial judge followed the jury's recommendation and sentenced Lott to death. On direct appeal, the Florida Supreme Court affirmed Lott's murder conviction and sentence. See Lott v. State, 695 So. 2d 1239 (Fla. 1997) ("Lott I").

Lott filed a Florida Rule of Criminal Procedure 3.850 motion for postconviction relief that alleged, inter alia, ineffective assistance by his trial counsel for (1) failing to investigate adequately Lott's alibi and (2) interfering with Lott's right to testify. The state postconviction court held an evidentiary hearing. Lott testified and "gave an extensive alibi for the weekend of the murder" that involved Lott being with his wife Tammy:

> On Saturday morning [Lott] went with his wife, Tammy, to his boss's house and then to his parents' house, where he spent much of the afternoon. His parents were planning to drive to an RV park in St. Augustine, so he agreed to watch their puppies. A picture of him with the puppies, purportedly from that Saturday, was introduced as evidence. That night, Lott went to Blockbuster to rent videos, which he returned early the next morning. Then he went for a drive with Tammy that lasted most of Sunday. They drove first to Palatka and

5

then toward Starke so that Lott could show his wife a prison where he was once incarcerated. Arriving around noon, they circled the parking lot. While driving out of Starke, they stopped at a convenience store and then a fruit stand. Lott recalled speaking with the stand's owner about fishing and Lake Okeechobee. Then they drove to St. Augustine to make sure that Lott's parents made it to the RV park. He saw their RV, but did not stop to say hello because "they'd have had me the rest of the day." Next they stopped to eat at a Sonny's restaurant in St. Augustine at about 2:30 p.m., paying in cash. Finally, they took the coastline down to Daytona, getting there at 4:30 p.m., and drove home to DeLand.

Lott II, 931 So. 2d at 813. After returning home on Sunday night, Lott left again and encountered Whitman, who showed him Conners's ATM card and asked him to withdraw some money. Lott, who was high on cocaine, did so, and then he and Whitman remained together alone until about 11:00 p.m. Id.

Lott was represented at trial by lead counsel Joel Spector and second-chair counsel Scott Richardson. Before trial, Spector assigned an investigator to follow up on alibi-related leads. The investigator spent nine hours in one day trying to locate witnesses (1) from the fruit stand near Starke and (2) the Sonny's restaurant in St. Augustine. The investigator was unsuccessful. After the investigator reported back to Spector, he and Spector jointly decided a further search would be futile.

Shortly before trial, Tammy Lott contacted Spector and told him she would not testify. Tammy told Spector, "I'm not going to lie for [Lott] anymore and I'm

6

not going to testify." Id. at 814. "At that point, Spector decided that the alibi had 'fallen pretty flat.'" Id.

Lott told Spector he wanted to testify about his alibi. Spector thought Lott's testimony would be more harmful than beneficial because of Lott's prior violent felony convictions and his bad temper.[1] Toward the end of trial, Spector enlisted another experienced criminal defense attorney, Raymond Goodman, to help him persuade Lott that testifying would be harmful to Lott's case. Lott ultimately agreed not to testify, but stated during the Rule 3.850 hearing that he was "really confused" and "nervous," and he agreed not to testify "to pacify" Spector.

Lott's postconviction counsel located Elmer Jones, the fruit stand operator. At the Rule 3.850 hearing, Jones testified that he operated a fruit stand near Starke, and that he remembered speaking with Lott at his stand (which was only open on weekends) about fishing and Lake Okeechobee. Jones believed the conversation occurred in the afternoon, but did not know the date. Jones testified it could have happened "anywhere from the 'early eighties up until 1996.'" Id. Jones also testified that Lott had visited his fruit stand repeatedly, which contradicted Lott's testimony that he had only been there once.

After the evidentiary hearing, the state postconviction court denied Lott's

---

[1]Lott was previously convicted of three armed robberies and an attempted escape from jail that involved the use and threat of violence to a jail employee.

Rule 3.850 motion, finding that he had shown neither deficient performance nor prejudice on any of his ineffective trial counsel claims. The Florida Supreme Court affirmed. See Lott II, 931 So. 2d at 815-20. As to Lott's claim that his counsel inadequately investigated his alibi defense, the Florida Supreme Court concluded that Lott "clearly ha[d] not shown prejudice" because Jones – the only new witness postconviction counsel found and presented at the Rule 3.850 hearing – "would have been of minimal value" as an alibi witness because he could not even identify the year in which his encounter with Lott took place. Id. at 815. Further, even if the jury did believe Lott talked with Jones at the latter's fruit stand on the afternoon of Sunday, March 27, 1994, there was still plenty of time for Lott to have committed the murder within the 27-hour period in which the medical examiner opined that Conners died. Id. Thus, the Florida Supreme Court concluded that given the other evidence of Lott's guilt – the palm prints, the shoe impressions, the fibers, Lott's use of Conners's ATM card and his attempt to sell her jewelry – its confidence in the verdict was not undermined by Jones's testimony. Id. at 815-16.

As to Lott's claim that Spector interfered with Lott's right to testify, the Florida Supreme Court affirmed the denial of that claim because competent, substantial evidence supported the state postconviction court's finding that Lott

8

decided voluntarily to follow Spector's recommendation that he not testify. Id. at 817-19. The Florida Supreme Court concluded that Spector's recommendation was based on "reasonable, strategic considerations" and thus was not deficient performance. Id. at 819-20.

Subsequently, Lott filed his § 2254 petition in federal district court. Lott's § 2254 petition alleged ineffective counsel in failing to adequately investigate the alibi defense and in interfering with his right to testify. The district court denied both claims on the merits, and declined to issue a COA. Lott then filed a COA application with this Court.

## II. DISCUSSION

This Court may issue a COA from the denial of a § 2254 petition "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003) (quotation marks omitted). Where, as here, the Antiterrorism and Effective Death Penalty Act ("AEDPA") applies, "[w]e look to the District Court's application of AEDPA to petitioner's constitutional

9

claims and ask whether that resolution was debatable amongst jurists of reason." Id. The petitioner need not show he will ultimately succeed on appeal, for "[t]he question is the debatability of the underlying constitutional claim[s], not the resolution of that debate." Id. at 342, 123 S. Ct. at 1042.

Lott seeks a COA as to both of his § 2254 ineffective trial counsel claims. To establish ineffective assistance of counsel, a defendant must show both that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). The performance prong requires the petitioner to show that his counsel's conduct was objectively unreasonable in light of professional norms prevailing at the time. Bobby v. Van Hook, 558 U.S. —, 130 S. Ct. 13, 16 (2009). The prejudice prong requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding" – here, the jury's guilty verdict – "would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

As to Lott's alibi defense, we conclude that jurists of reason would not debate the correctness of the district court's denial of Lott's claim of ineffective assistance of counsel in investigating an alibi defense. Lott cannot make even a debatable showing of deficient performance. First, Spector testified that he

10

prepared for an alibi defense. As part of his preparations, he sent an investigator to try to locate the fruit stand operator and the waitress who served Lott at the Sonny's restaurant. The investigator engaged in an unsuccessful nine-hour, single-day search, after which Spector and the investigator decided not to search further. Lott claims this decision was objectively unreasonable, arguing that "a one time attempt to locate an essential witness is not enough." However, neither Jones nor the unknown waitress can be reasonably deemed "essential," as – at best – each could only corroborate a small portion of the 27-hour period for which Lott needed an alibi. Second, while post-conviction counsel did locate fruit stand operator Jones, Jones could only say he talked to Lott sometime between the 1980s and 1996. And post-conviction counsel never located the alleged Sonny's waitress. Third, until shortly before trial, Spector anticipated that Tammy Lott would testify about the Lotts' entire alleged trip to North Florida on Sunday, March 27, 1994 during which the Jones and waitress encounters took place. And once Tammy Lott announced she would not testify for her husband, Spector made the strategic choice not to use an alibi defense because at that point he believed the "whole strategy seemed to fall on its face." Under the circumstances, we conclude jurists of reason would not debate whether the performance prong was satisfied as to the alibi claim.

Similarly, we conclude that Lott cannot make a debatable showing as to the

prejudice prong. To show prejudice for this claim, Lott must establish a reasonable probability that he would have been found not guilty had Jones been located before trial.[2] However, at the Rule 3.850 hearing Jones was unable to pinpoint the decade, much less the date, when his conversation with Lott took place. This lack of chronological specificity would have rendered Jones of minimal value as an alibi witness. Further, even if Jones had been able to recall the date and time of his conversation with Lott with precision, it would not be enough. Again, Jones could only at best corroborate a small portion of the time for which Lott needed an alibi, and with Tammy Lott's decision not to testify, Jones would have stood as the only witness to corroborate Lott's alibi. Jones's value as a witness to Lott was also undermined by the fact Jones said Lott visited his fruit stand several times, whereas Lott insisted he met Jones only once. Against the wealth of incriminating evidence presented by the State, reasonable jurists would not debate the conclusion that locating Jones before trial would not have raised a reasonable probability of a not guilty verdict.

Likewise, we find that Lott has not satisfied the COA standard as to his claim that trial counsel Spector was ineffective in interfering with Lott's right to

---

[2]To the extent Lott's alibi witness claim extends to the Sonny's waitress, jurists of reason would not debate whether Lott can show prejudice. Since the Sonny's waitress was never found to provide testimony, it cannot be reasonably argued that Lott has met his burden of showing a reasonable probability of a different result if she had testified.

testify. Lott argues he did not voluntarily waive his right to testify, but instead was "browbeaten" by Spector and Goodman into not testifying. However, as the Florida Supreme Court noted, after hearing the 3.850 testimony, the state postconviction court found that Lott "made a 'voluntary decision, and a joint decision,' with counsel not to [testify]." Lott II, 931 So. 2d at 817 (quoting state postconviction court order). The record amply supports this finding, for Lott told the state trial court as much in a colloquy at the end of the guilt phase:

| | |
|---|---|
| THE COURT: | . . . Mr. Lott[,] are you satisfied with the representation of your two lawyers[?] |
| THE DEFENDANT: | Yes, ma'am. |
| . . . . | |
| THE COURT: | Okay. Did the attorneys do everything that you anticipated they would do? |
| THE DEFENDANT: | Yes, ma'am. |
| THE COURT: | And was it a joint choice by all three of you that you would not testify in the trial? |
| THE DEFENDANT: | Yes, ma'am. |
| THE COURT: | Okay. Is there anything that they did that you didn't want them to do? |
| THE DEFENDANT: | No. |
| THE COURT: | So you're satisfied with everything they've done? |
| THE DEFENDANT: | Yes, ma'am. |

(Emphasis added.) And, both Spector and Richardson testified that after the discussion between Spector, Lott, and Goodman, Lott decided not to testify.

Further, and in any event, reasonable jurists would not find debatable the district court's conclusion that Lott could not show prejudice as to this claim. The

13

trial evidence against Lott was overwhelming, and his proposed testimony from the Rule 3.850 hearing does not even arguably raise a reasonable probability of a different result.

### III.  CONCLUSION

Petitioner Lott has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Accordingly, his application for a COA is denied.

**APPLICATION DENIED.**