695 So.2d 1239 (1997)
Ken Eldon LOTT, Appellant,
v.
STATE of Florida, Appellee.
No. 86108.
Supreme Court of Florida.
May 22, 1997.
Rehearing Denied June 20, 1997.
*1240 James B. Gibson, Public Defender and George D.E. Burden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General and Margene A. Roper, Assistant Attorney General, Daytona Beach, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Ken Eldon Lott. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
On the morning of March 28, 1994, Rose Conners was found murdered, lying unclothed in the master bedroom of her home. The right side of Conners' throat had been slashed, her larynx had been fractured, she had been struck in the head with a blunt object and she had a single stab wound in the back. There were duct tape lines on her legs, arms, and face suggesting that Conners was bound and gagged prior to being killed and that the tape was removed after her death. There were bruises on Conners' arm matching the imprint of a set of pliers found at the scene. The medical examiner testified that the blow to Conners' head in combination with the pressure to her neck rendered her unconscious. The blow to Conners' head was inflicted anywhere between a few minutes and thirty minutes before her neck was cut. The injury to her neck, which partially cut the jugular vein, was the cause of Conners' *1241 death. The medical examiner estimated that Conners died sometime between 2 p.m. on Saturday, March 26, 1994 (the last time Conners was known to be alive), and 5 p.m. on Sunday, March 27, 1994. Although there was no evidence of sexual battery found by the medical examiner, there was significant bruising in the thigh area, suggesting that pressure had been applied to force her legs apart. Conners had a defensive wound on her right thumb. Abrasions were found on Conners' elbows and knees and her torn panties were found underneath a bed in another bedroom of her house.
When Conners' sister went through Conners' effects, it was discovered that Conners' diamond tennis bracelet was missing. In April of 1994, Lott offered to sell a gold ring and a diamond tennis bracelet to David Pratt, a friend, but Pratt refused the offer. Sometime after Easter of 1994, Lott went over to Robert Whitman's house and stated that he had some jewelry, which included a gold ring and a diamond tennis bracelet that came from a robbery and murder in Jacksonville, that he wanted to get rid of. A week later, Lott returned to Whitman's house and told Whitman that Lott and a friend, Ray Fuller, had killed Rose Conners. Lott told Whitman that he and Fuller had been using "crystal meth" and cocaine, and when they ran out of money and drugs they decided to rob Conners. Lott knew Conners because a few months before he had provided lawn services to her. Lott and Fuller planned to have Fuller tie, gag, and blindfold Conners since she did not know Fuller. However, Conners saw Lott when she escaped from the house and Lott had to come out from the bushes where he was hiding to catch her and bring her back inside.
Lott told Whitman that Conners had no cashonly gold and jewelry. Lott said that he beat Conners because she was fighting like a mad dog when he grabbed her and brought her back into the house. Lott said Conners begged him not to kill her and offered to sign her car over to them and take them to the bank to get money. Lott also told Whitman that he had to kill Conners because she knew him and would send him to prison. He said he cut Conners' throat with a boning or fillet knife. Lott also said that he returned to Conners' house that night and cleaned up the scene.
In May of 1994, Robert Whitman contacted the Orange County Sheriff's Department and reported what he had been told by Lott. The sheriff's department devised a plan to have Whitman meet with Lott regarding the stolen jewelry. At this meeting Whitman told Lott he would sell the jewelry for him and then gave Lott $600 for the jewelry. When Lott drove off, sheriff's deputies pursued him and took him into custody.
In addition, the State submitted fingerprint, shoe print, and fiber evidence establishing Lott's presence at the scene and proof that Lott was in possession of Conners' diamond tennis bracelet, ring, and ATM card shortly after the crime. The State argued that Lott used a pair of pliers on Conners' arm when questioning her about her valuables and her PIN number for her ATM card. Photographs taken by Conners' bank established that Lott used Conners' ATM card to retrieve money from a cash machine on Sunday, March 27, 1994. Coworkers of Lott's wife testified that Lott's wife was seen wearing Conners' tennis bracelet subsequent to Conners' death.
Because all of the evidence of what occurred during the murder consisted of testimony by Whitman concerning what Lott told him, Lott predicated his defense on the theory that he was set up by Whitman. Whitman admitted that he had been convicted of three or four felonies. He further admitted that he had been supplying drugs to Lott. Whitman also said that twenty-three years ago Lott had informed on him and gotten him in trouble with the law. Lott asserted that Whitman made up the story of Lott murdering Conners because Whitman wanted revenge for that incident.
The jury found Lott guilty of first-degree murder. At the sentencing phase, the jury recommended death by a unanimous vote. Lott later testified at a sentencing hearing held pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993), that he had been in Conners' master bathroom in February of 1994 giving her advice about plantings outside her window, and that is how his palm print came to *1242 be on the sink. He had no explanation for the existence of prints in the other bedroom or his shoe prints in another part of the house. Lott also admitted that he was the person who used Conners' card at the ATM, but he contended that he got the card and the PIN number from Whitman and did not notice that Rose Conners' name was on the card.
The trial court found that the following aggravators applied to Lott: (1) he had a previous conviction for a violent felony based on three prior armed robbery convictions and one prior attempted escape conviction; (2) the murder was committed during the commission of a burglary and/or kidnapping; (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (4) the murder was committed for pecuniary gain; (5) the murder was especially heinous, atrocious, or cruel (HAC); and (6) the murder was committed in a cold, calculated, and premeditated manner without pretense of moral or legal justification (CCP). The trial court also found that the following mitigators applied: (1) the murder was committed while Lott was under the influence of extreme mental and emotional disturbance (given considerable weight by the trial court); (2) Lott's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired (given considerable weight by the trial court); (3) that Lott suffered from drug addiction (given considerable weight by the trial court); (4) that Lott contributed to his community through volunteer work (given slight weight by the trial court); (5) that Lott was helpful to his parents as a child and an adult (given some weight by the trial court); and (6) that Lott maintained steady and gainful employment (given some weight by the trial court). The trial court found that the aggravating circumstances outweighed the mitigating circumstances and followed the jury's recommendation that Lott be sentenced to death.

Guilt-Phase Issues
Lott's first issue challenges the sufficiency of the evidence presented by the State. Lott asserts that the evidence failed to establish that Lott, and no other person, murdered Conners. Lott further contends that without Whitman's unreliable testimony the State's case against Lott is based entirely on circumstantial evidence.
Regardless of the dispute over his credibility, Whitman's testimony was direct evidence of Lott's guilt and the jury was entitled to believe it. Moreover, the State presented substantial circumstantial evidence, all of which pointed to Lott's guilt. The evidence was more than sufficient to sustain Lott's conviction of first-degree murder.
In his second issue, Lott asserts that the trial court erred in refusing to permit Whitman's brother to testify regarding Whitman's reputation for untruthfulness. Pursuant to section 90.609, Florida Statutes (1993), a party may use character evidence to attack the credibility of a witness if the evidence relates to the witness's reputation for truthfulness. However, a foundation must first be laid to establish that the person testifying as to the witness's reputation is aware of the witness's reputation for truthfulness in the community. Charles W. Ehrhardt, Florida Evidence § 405.1 (1995 ed.). Reputation evidence must be sufficiently broad-based and should not be predicated on "mere personal opinion, fleeting encounters, or rumor." Rogers v. State, 511 So.2d 526, 530 (Fla.1987).
The testimony proffered by Whitman's brother indicated that it was based on his and his family's personal experiences with Whitman rather than on any broad-based knowledge of the community's opinion of Whitman's reputation for truthfulness. Under these circumstances, we cannot say that the trial court abused its discretion in refusing to admit the testimony. See Heath v. State, 648 So.2d 660 (Fla.1994)(trial court has wide discretion in ruling on the admissibility of evidence and its rulings will not be disturbed absent an abuse of discretion). We also note that Lott's mother was allowed to testify regarding Whitman's reputation for untruthfulness in the community.
Lott's third issue, asserting that Lott's mother should have been permitted to testify that Lott told her that he had done lawn work for Conners, is also without merit *1243 because the evidence was clearly hearsay. Self-serving statements are not admissible under section 90.803(18), and Lott has pointed to no other exception to the hearsay rule which might be applicable. Moreover, Whitman testified that Lott told him that he had done some landscaping for Conners at her house.
We find that Lott's fourth issue challenging the admission of crime scene photographs is procedurally barred due to Lott's failure to identify objectionable photographs or state specific grounds for reversal other than asserting that the photographs were gruesome. In any event, Lott's challenge to the photographs is devoid of merit. The trial court viewed the photographs prior to their submission to the jury and properly determined that they were necessary and relevant to demonstrate the manner in which Conners died, the nature of her injuries, and the method by which her injuries were inflicted. See Bush v. State, 461 So.2d 936, 939 (Fla.1984). No unnecessarily inflammatory photographs were introduced into evidence. Given the probative value of the photographs in supporting the State's charge of premeditated murder and existence of the HAC aggravator, the trial judge did not abuse his discretion in admitting them.
Lott's fifth and final guilt phase issue challenges the trial court's denial of Lott's motion for sanctions for violations of the rule of witness sequestration committed by the State. There is no question that three of the State's witnesses; Detective Griffis, Sergeant Corriveau, and Kristen Hayes (a forensic analyst with the sheriff's department) discussed certain aspects of the murder investigation while they were in a back witness room during the presentation of the State's case. Detective Griffis had already testified and Sergeant Corriveau and Kristen Hayes were scheduled to testify after the medical examiner testified. One of the prosecuting attorneys went to the room where the three witnesses were conversing, and as soon as he realized that these witnesses had not been told that the rule of sequestration had been invoked and that a violation had occurred, he informed the trial court.
The trial court questioned each of the witnesses in depth about the content of their conversation, and both the prosecution and defense counsel were given an opportunity to question the witnesses. All three of the witnesses had been involved in the processing of evidence at the crime scene. Their conversation had mainly focused on whether one or two sets of pliers had been found at the crime scene. Defense counsel then asked the trial court to sanction the State by excluding the witnesses from testifying. The trial court denied defense counsel's request for sanctions and made the following statements on the record:
[S]o far I have seen nothing to base any sanctions on. I'm certainly not going to exclude crimes scene technicians and people that comb the area and processed evidence when there's no indication there's anything done deliberately to change any testimony. I don't see that it happened that way. I agree if there were eyewitnesses changing their story about what they had seen there'd be a serious problem. I'd be throwing the witnesses out. But I don't see it in this case.
"[T]he rule of sequestration is intended to prevent a witness's testimony from being influenced by the testimony of other witnesses in the proceeding." Wright v. State, 473 So.2d 1277, 1280 (Fla.1985). A trial court has discretion in the enforcement of the rule of sequestration. Id. In this case, the three witnesses testified regarding the physical evidence found at the crime scene. All of the evidence collected at the scene had been carefully documented months before trial. Thus, there was no danger that the conversation among the witnesses could have influenced them to change their testimony in any meaningful way. Moreover, the three witnesses were unaware that the rule of sequestration had been invoked, and the attorneys representing the State were unaware that the witnesses were conversing together. Violation of the rule of sequestration was therefore inadvertent and did not involve any bad faith on the part of a witness, party, or counsel. Id. Accordingly, we find that the trial court properly exercised its discretion in denying defense counsel's request for sanctions.

*1244 Penalty-Phase Issues

Lott's first penalty-phase issue asserts that the trial court erred when it instructed the jury on the HAC aggravator and when it found that this aggravator applied to Conners' murder. He does not attack the form of the instruction. Arguing that the medical examiner's testimony supports the inference that Conners was unconscious at the time of the fatal attack, Lott contends that the HAC aggravator was not proven beyond a reasonable doubt and the very presence of the instruction was confusing and misleading to the jury.
With respect to this aggravator, the trial court stated in the sentencing order:
Based on the evidence, this crime occurred over a period of time. From the minute Defendant entered the home until the victim was choked into unconsciousness (hopefully), she suffered unspeakable humiliation, terror, and pain. She was so afraid she defecated on herself, her panties with feces on them were removed in one bedroom, she was completely nude and died in the master bedroom. Her mouth, wrist, and ankles were taped making her totally defenseless. Plier marks were on her arm. The State suggests the pliers were used to get her to tell her attacker(s) her ATM number. That is a reasonable possibility and perhaps the least onerous. There is no way of knowing how long this torturous assault lasted, but common sense dictates that it could not have been brief. Once the Defendant got everything he needed from Rose Conners, he deliberately slashed her throat, and to be sure she was dead, he stabbed her in the back. These acts were definitely conscienceless, pitiless, and unnecessarily torturous.
These facts, which are supported in the record, show beyond a reasonable doubt that Conners' murder was heinous, atrocious, or cruel. We have previously upheld the application of the HAC aggravator when the victim has been tortured, either physically or emotionally. Cook v. State, 542 So.2d 964 (Fla.1989). The fear and emotional strain suffered by the victim can also be considered in determining whether the murder was heinous, atrocious, or cruel. Preston v. State, 607 So.2d 404, 410 (Fla.1992). Although Conners may not have been conscious at the time that Lott made the fatal slash which caused her death, the physical torture and emotional trauma she suffered during the time leading up to her death justify application of the HAC aggravator. Lott's contention that the HAC aggravator violates the Eighth Amendment because it fails to adequately channel the discretion of the jury is also without merit. Washington v. State, 653 So.2d 362, 366 (Fla.1995); Lucas v. State, 613 So.2d 408, 410 (Fla.1992).
Lott's second penalty-phase issue asserts that the trial court erred when it permitted the State to introduce into evidence letters from the Department of Corrections (DOC) regarding Lott's prior attempted escape conviction. Our review of the record establishes that the trial court did not allow the DOC letters that Lott complains about to be introduced into evidence. The trial court instead limited the State's presentation regarding Lott's prior attempted escape conviction to the judgment and sentence and a redacted portion of the post-sentence investigation. This claim is therefore without merit.
Lott's third penalty-phase argument asserts that the trial court erred in instructing the jury on the CCP aggravator. Lott does not challenge the form of the instruction, but rather the fact that the instruction was given at all. He contends that the CCP aggravator did not apply to Conners' murder and that instructing the jury on this inapplicable factor affected the jury's recommendation. In its sentencing order, the trial court made the following findings regarding the CCP aggravator:
Although this crime began as a caprice, it escalated over the period of time it took for all the activity described above to take place, From the moment Rose Conners saw Ken Lott, her fate was sealed. Although it appears the original plan was to take money or valuables, once the victim saw the Defendant the decision was made that she would have to die. It was too much of a chance she would send him to prison if left alive. The evidence shows a heightened level of premeditation indicating *1245 a plan to kill the victim. A sufficient amount of time was necessary to account for things that were done to Ms. Connersmore than enough time to formulate a plan to kill. The duct taping, the search for valuables, ascertaining the PIN to withdraw money from the ATM, removing her clothes. This murder was not just incidental to the burglary and theft. It was the result of a deliberate, separate, conscious decision.
This aggravating circumstance [CCP] was proved beyond a reasonable doubt.
Pursuant to Jackson v. State, 648 So.2d 85 (Fla.1994), four elements must be proven in order for the CCP aggravator to be applicable: (1) the murder must be the product of cool, calm reflection rather than prompted by emotional frenzy, panic, or a fit of rage; (2) the murder must be the product of a careful plan or prearranged design; (3) there must be "heightened premeditation," over and above the premeditation required for unaggravated first-degree murder; and (4) there must be no pretense of moral or legal justification for the murder. Jackson, 648 So.2d at 89; Walls v. State, 641 So.2d 381, 387-88 (Fla.1994).
The evidence presented at trial establishes that all four of these elements were present in this case and that the trial court properly found that the CCP aggravator applied to Conners' murder. Although Lott's original plan was to take Conners' money or valuables without Conners seeing him, once Conners saw him he decided he had to kill her in order to avoid being sent to prison. Lott did not kill Conners immediately, but instead took the time to bind Conners with duct tape, search for valuables, obtain Conners' PIN number so that he could withdraw money from her ATM, remove Conners' clothes, and then beat and strangle her before he slit her throat and stabbed her in the back. In any event, even if it could be said that CCP was not proven, any error in instructing and finding CCP as an aggravator would be harmless beyond a reasonable doubt.
We also reject Lott's claim that his death sentence is not proportionate. The record below contains competent, substantial evidence to support the trial court's finding that the aggravators outweigh the mitigating evidence and that Conners' murder falls within the class of killings for which the death penalty is appropriate. Moreover, the facts of this case establish that Lott's death sentence is proportional to other cases in which sentences of death have been imposed. See Johnson v. State, 660 So.2d 648 (Fla. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996); Walls.
We reject, without discussion, Lott's arguments (1) that the trial court improperly admitted victim impact evidence; (2) that the trial court committed prejudicial error in failing to sustain an objection to certain cross-examination of Lott's stepfather; and (3) that section 921.141, Florida Statutes (1993), is unconstitutional.
Accordingly, we affirm Lott's conviction and sentence of death.
It is so ordered.
OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs as to conviction and concurs in result only as to sentence.