965 So.2d 246 (2007)
Milton Mack MITCHELL, Sr., Appellant,
v.
STATE of Florida, Appellee.
No. 4D06-2153.
District Court of Appeal of Florida, Fourth District.
September 12, 2007.
Rehearing Denied October 26, 2007.
*247 Carey Haughwout, Public Defender, and Tatjana Ostapoff, Assistant Public Defender, West Palm Beach, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Richard Valuntas, Assistant Attorney General, West Palm Beach, for appellee.
WARNER, J.
Appellant, Milton Mack Mitchell, Sr., appeals his convictions for first-degree murder and possession of a firearm by a convicted felon. He raises four issues, none of which require reversal. First, he claims that the court erred in refusing to admit a statement of a deceased witness as an excited utterance, but that issue was not preserved. Second, he sought to admit the dying declaration of a witness to the murder, which Mitchell claims was an exoneration, but the court properly excluded it as hearsay. Third, the court correctly excluded "expert" testimony that the defendant could have considered himself under attack at the time of the murder, as the subject was not beyond the jury's common experience. Finally, Mitchell's claim that he was entitled to a self-defense instruction has been decided adverse to his position in Smiley v. State, 32 Fla. L. Weekly S303, ___ So.2d ___, 2007 WL 1628111 (Fla. June 7, 2007). We affirm.
It is uncontested that Mitchell shot Henry Wilson to death. Mitchell maintained that he acted in self-defense, after a history of incidents of harassment by Wilson and his friends.
On the day of the murder, Mitchell had purchased crack cocaine from Wilson's brother, Virgil Dixon, but Mitchell claimed it was fake and wanted his money back. He went with his friend, Alma Wright, to talk with Dixon and Wilson's mother, Betty Dixon, who was at her daughter's house. Ms. Dixon offered to pay him back, but he wanted the money from Dixon. He then left and went home. Ms. Dixon could tell Mitchell was angry and had been drinking.
Later that day, Wright came by to say that "Papa" (Henry Wilson) had showed up, and she thought there was going to be trouble. Mitchell armed himself with a gun and went outside to confront Wilson. The two argued for five or ten minutes in the presence of Wilson's cousin, Javier Williams, who heard Mitchell say, "I'm going to kill somebody or somebody going to kill me." Then Mitchell left.
Shortly thereafter, Mitchell returned and Wilson spotted Mitchell in the bushes across from where Wilson and Williams were sitting. Wilson called for Mitchell to get up. Williams saw Mitchell shoot one *248 time before he came out of the bushes and asked where Virgil was. Mitchell and Wilson began to argue again and Mitchell shot him in the shoulder with a .22 caliber gun. Wilson tried to pull Mitchell towards him, to keep Mitchell from shooting again. Mitchell shot one more time and Wilson fell against the wall. Wilson ran towards the corner, where he fell. When rescue personnel arrived, they pronounced Wilson dead at the scene. Williams never saw Wilson point a firearm at Mitchell or do anything to provoke Mitchell. Several other witnesses testified, essentially confirming many of the same details of the day.
Mitchell testified in his defense and provided a substantially different version of events. According to Mitchell, he was outside, heard a gunshot, and walked to the end of the building where he saw Javier Williams. Williams yelled a profanity noting his presence. He believed that he was being pursued by a gang which included Wilson and Williams. Mitchell started to run but when he saw a car that he believed contained members of the gang, Mitchell dropped to the ground and took cover. Shortly thereafter, he saw Henry Wilson, Freddie Daniels, Martez Daniels, and Javier Williams. Mitchell heard a gunshot, which he assumed was fired by Wilson, and then heard someone call to him. Mitchell stood up, realizing that he had been seen.
As Mitchell walked out across the street towards his room, Wilson blocked his path. Wilson confronted him about the dispute with his brother. Wilson swung at him, and Mitchell heard someone say, "Kill that n. . . ." Mitchell saw Wilson grab something silver from his pants, which Mitchell thought was a gun. Mitchell grabbed his gun and shot one time. Wilson fell against the wall and then came forward, pushing at him, but Wilson's hand was still in his pocket. Mitchell fired a second time. He maintained that he fired the two shots from his weapon in self-defense, not intending to kill anybody, because he was in fear for his life and was trying to stop the attack.
The jury found Mitchell guilty as charged, including a charge of possession of a firearm by a convicted felon. The court sentenced Mitchell to life without possibility of parole for the first-degree murder charge and fifteen years as a habitual offender for possession of a firearm. This appeal follows.
In his first issue on appeal, Mitchell claims that the court erred in refusing to admit the testimony of one of his witnesses, Frankie Neal. Prior to trial, the defense proffered that Neal heard Freddie Daniels, a member of the gang that included victim Wilson, ask Wilson, "What are you shooting in the bushes for?" The victim responded that he was shooting at Mitchell to bring him out of the bushes. Defense argued that this statement constituted a spontaneous declaration or an excited utterance. Initially, the court considered it as offered to prove the truth of the matter.
However, the transcript shows that the court actually reserved ruling on the issue of what testimony would be admitted. When confronted with the issue, the court said, "Right. Mr. Frankie Neal, I'm reserving on the issue of Frankie Neal testifying to what he heard Freddie Daniels say he did, not what Mr. Wilson said." (emphasis supplied).
When Eddie Neal, Frankie's brother, testified, the defense sought to proffer a statement made by Freddie Daniels. The following exchange took place:
THE COURT: Frankie Neal reserved to testify what Mr. Daniels said that he didn't  that he did and saw. Was it  *249 was it your mistake that it wasn't Frankie Neal, that it was Ed Neal?
MR. UDELL: Either way, Judge, I'm asking for the opportunity at this time, I want to offer the evidence and have additional testimony to support the offering of the evidence.
Eddie Neal then testified through proffer of statements Freddie Daniels made several days after the shooting. He did not testify to any question Daniels may have asked on the day of the shooting. The court refused to admit these statements.
When Frankie Neal testified, he explained that he heard gunshots while in his room which was next to Mitchell's room. The shots woke him up. He put on his shoes and stepped outside to see what was going on. Neal walked down the sidewalk of the apartment complex. Once he got to the end of the building, he stood there for a minute or so trying to figure out what was going on concerning the gunshots. He then noticed Freddie Daniels in the area approaching Wilson. Neal began to testify that Daniels asked Wilson "why did he shoot," when the prosecutor cut him off with an objection. The court asked if it had not ruled on this issue, but the defense attorney said that he was trying to elicit Wilson's statement, not Daniels's question.
Counsel never proffered Neal's testimony as to Daniels's question to Wilson on the day of the shooting, nor did counsel request its admission. Instead, Neal testified to Wilson's statement. Although the prosecutor objected to this statement, the court overruled the objection. Neal then testified that as he was standing there, he heard Wilson say, in response to a question posed by Daniels, "[expletive deleted] Milton is out there in those bushes," and that "[h]e better bring his ass out."
When examining the entire record, this issue of the admission of Daniels's question to Wilson was not preserved for review. The court reserved on the issue, and counsel never proffered the statement, nor again moved for its admission. While we do not necessarily understand why the court would have permitted the admission of Wilson's answer and not the question by Daniels (either both are admissible as excited utterances/spontaneous statements or neither is), nevertheless the defense did not renew its request for its admission.
The trial court must evaluate the evidence and surrounding circumstances to determine whether a statement may qualify as an excited utterance or spontaneous statement. Section 90.803(1) provides an exception to the hearsay rule for a "spontaneous statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, except when such statement is made under circumstances that indicate its lack of trustworthiness." Similarly, section 90.803(2) allows for the admission of "[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."
Most questions or inquiries are not hearsay. Powell v. State, 714 N.E.2d 624, 628 (Ind.1999). However, an utterance that is in the form of a question can in substance contain an assertion of fact, such as the question, "Joe, why did you stab Bill?" Id. Such an utterance clearly carries a factual allegation within it, and should be subject to cross-examination unless exempt for some other reason. Id. The question in this case contained an assertion of fact, namely that Wilson had shot into the bushes. Whether Wilson shot at Mitchell first was an important factual issue in the case.
The trial court needed to analyze the entire scenario in order to determine if the *250 statement was admissible. Neal's testimony indicates a delay between the first shots being fired and Daniels's question. Neal had time to arise from his sleep, get dressed, exit his room, go around the corner, stop for a few minutes to collect himself, and then he heard Daniels's question. The trial testimony, however, is sometimes hard to follow, and that is why the trial court in the first instance must determine whether the criteria for admitting the statement as an excited utterance or spontaneous declaration have been met. Because the court reserved on the issue and was not later requested to rule, the matter is not preserved.
A couple of hours after the shooting Freddie Daniels made a statement to several people, including Eddie Neal, that Wilson shot into the bushes first, and then Mitchell shot at Wilson. About a year later Daniels allegedly told other witnesses that he had been offered leniency in his own criminal case if he would lie in the Mitchell case, for which he was very sorry. Unfortunately, Freddie Daniels died just a few days after making this statement. The defense sought to admit these statements of "exoneration." Neither, however, could be considered within the limited exception for dying declarations.
Section 90.804(2)(b) establishes a "dying declaration" exception to the general rule excluding hearsay:

Statement under belief of impending death.In a civil or criminal trial, a statement made by a declarant while reasonably believing that his or her death was imminent, concerning the physical cause or instrumentalities of what the declarant believed to be impending death or the circumstances surrounding impending death.

(emphasis supplied). Here, none of the statements sought to be introduced concerned the physical cause or instrumentalities of Freddie Daniels's death or the circumstances surrounding his impending death. In fact, as the trial court noted, some of the statements were made more than one year before the declarant's death, with no indication that they were made while the declarant reasonably believed that his death was imminent. The statements did not qualify as dying declarations. See Castle v. State, 305 So.2d 794 (Fla. 4th DCA 1974).
To further support his claim of self-defense, Mitchell sought to introduce the testimony of a mental health expert, whom the court had appointed to give Mitchell a competency examination. Dr. Steven Edney found Mitchell competent and legally sane at the time of the incident. His report also noted:
Based on the information he provided during the present examination, it would appear that [his] actions were not premeditated. That is, his actions were the result of self defense as he perceived that his life was in significant and immediate danger. His perceptions are consistent with his having a reasonable belief in the imminence of bodily harm/death and he therefore reacted in a manner similar to how other individuals in that situation could reasonably be expected to react. Again, it is documented that Mr. Mitchell suffered harassment and aggression from the individuals involved in this incident over a significant period of time, instilling an overall feeling of fear/anxiety in him. Moreover, by his account, he was unable to avoid the conflict and was forced to use aggression to avoid what he perceived as an imminent threat to his life.
. . . .
[I]t is apparent that Mr. Mitchell experienced abuse/harassment from the individuals involved in this incident and as a result, suffered from heightened *251 fear/anxiety and a higher level of vigilance. It is within reasonable psychological certainty that Mr. Mitchell's actions are consistent with his having had a reasonable belief in the imminence of bodily harm and in the necessity of using force to defend his own life.
The defense sought to present this testimony from Dr. Edney at trial, particularly his conclusion that Mitchell was acting in self-defense. The state objected on the grounds that Dr. Edney would not be testifying to Mitchell's competency or sanity. The state, relying on Lott v. State, 695 So.2d 1239 (Fla.1997), maintained that Dr. Edney's testimony should not be admitted because it was based on self-serving exculpatory hearsay. The court agreed, finding that the doctor would be offering a conclusion on an ultimate issue of fact based solely on Mitchell's self-serving statements to him.
There are four requirements for deciding the admissibility of expert testimony:
(1) that the opinion evidence be helpful to the trier of fact; (2) that the witness be qualified as an expert; (3) that the opinion evidence can be applied to evidence offered at trial; and (4) that evidence, although technically relevant, must not present a substantial danger of unfair prejudice that outweighs its probative value.
Anderson v. State, 786 So.2d 6, 8 (Fla. 4th DCA 2000) (quoting Holiday Inns, Inc. v. Shelburne, 576 So.2d 322, 335 (Fla. 4th DCA 1991)) (footnote omitted). In order to be helpful to the trier of fact, expert testimony must concern a subject which is beyond the common understanding of the average person. State v. Nieto, 761 So.2d 467, 468 (Fla. 3d DCA 2000). Expert testimony should be excluded where the facts testified to are of such a nature as not to require any special knowledge or experience in order for the jury to form conclusions from the facts. Johnson v. State, 393 So.2d 1069, 1072 (Fla.1980).
Dr. Edney's proffered testimony boils down to a statement that, based upon what Mitchell told him, Mitchell reasonably believed that he had to defend himself or be killed. There is nothing in his testimony which concerns a subject beyond the common understanding of the average person. If the jury believed Mitchell, then it would find that he acted in self-defense. Thus, the issue is not one on which expert testimony should be permitted. It merely allowed an expert witness to bolster Mitchell's credibility which is improper. Acosta v. State, 798 So.2d 809, 810 (Fla. 4th DCA 2001). And it improperly introduces Mitchell's self-serving statements which are otherwise inadmissible hearsay. See Lott v. State, 695 So.2d 1239, 1243 (Fla. 1997).
Finally, Mitchell sought to have the jury instructed in accordance with section 776.013, effective October 1, 2005, which provides for an expanded right of self-defense:[1]
A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony.
*252 § 776.013(3), Fla. Stat. The court denied the request, relying on State v. Smiley, 927 So.2d 1000 (Fla. 4th DCA 2006), where this court held that the expanded right of self-defense could not be applied retroactively to crimes committed prior to its passage. Our supreme court has approved Smiley and held that section 776.013 does not apply to cases pending at the time the statute became effective. See Smiley v. State, 32 Fla. L. Weekly S303, ___ So.2d ___, 2007 WL 1628111 (Fla. June 7, 2007). Therefore, the defense was not entitled to the requested jury instruction.
For the foregoing reasons, we affirm appellant's conviction and sentence.
SHAHOOD, C.J., and STEVENSON, J., concur.
NOTES
[1] The homicide was committed on February 25, 2003. The trial in this case was held from April 17 through April 20, 2006.