DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ASHLYN SALOMON,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D18-679

[March 20, 2019]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; Steven J. Levin, Judge; L.T. Case No. 56-2016-CF-002316A.

Carey Haughwout, Public Defender, and Siobhan Helene Shea, Special Assistant Public Defender, West Palm Beach, for appellant.

Ashley B. Moody, Attorney General, Tallahassee, and Luke R. Napodano, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

A jury rejected Ashlyn Salomon's claim of self-defense and convicted him of second degree murder with a firearm. Because of a fundamental error in the charge to the jury on his legal defense and improper credibility bolstering of witnesses by a state "expert," we reverse and remand for a new trial.

This case involved a shooting outside of an apartment house. Appellant lived in Apartment B with his girlfriend Briana Wilson, two children and Briana's grandmother. Briana's mother lived in Apartment D with her boyfriend, the victim Jonathan Maciel, and one other person.

The witnesses to the shooting and the events leading up to it were all civilians. Law enforcement did not become involved until after the shooting occurred. The case turned on the credibility of witnesses—which witnesses the finders of fact believed would determine the outcome.

Briana's mother and the victim got into a verbal argument about the victim's communication with another woman. Briana went into the

apartment, saw her mother arguing with the victim, and walked back outside. Briana called appellant at work and told him about the fight. While on the phone, Briana heard a loud "boom noise." She opened the door and saw the victim hit her mother. Briana told appellant she would have to call him back. She thought she had hung up the phone, but the line remained open and appellant overheard the unfolding ruckus.

The argument between the mother and the victim continued outside of the apartment. Briana began screaming at the victim. Hearing the commotion on the phone, appellant got in his car and rushed home.

Within 8-10 minutes, appellant sped into the apartment complex, parked in the middle of the parking lot, and jumped out of his car. Appellant testified that when he pulled up, it looked like the victim had shoved Briana. There were different versions of the words the victim exchanged with appellant, but the witnesses agreed that the victim and appellant ran towards each other and began "tussling" and wrestling. Briana and her mother separated the two men. The victim retreated to his apartment. Appellant fell back to his car, where he stood behind the open driver's side door.

Reaching into his car, appellant took out his firearm, and held it near his side because he felt that he needed his firearm to defend himself. Briana stood in front of appellant because she did not want him to chase the victim. Briana began pleading with appellant, telling him to stop and think of their daughter.

The victim reemerged from the apartment and headed towards appellant. There were varying accounts about how fast the victim approached appellant. There were also different versions of the lighting conditions. Most importantly, the witnesses varied in their description of the victim's hand placement as he headed for appellant. Only appellant testified that the victim had one hand concealed behind his back or at his side. No witness, not even appellant, saw a weapon in the victim's hands.

As the victim approached the front of appellant's car, appellant raised his gun and fired all 18 rounds; he claimed that he kept shooting because the victim kept coming at him. He testified that the victim was facing him the whole time until he twisted and fell. Other witnesses supported the view that the victim stopped after the first shot and began to retreat to the apartment. After the shooting, appellant backed his car into a space, placed his gun inside the car, and waited for the police to arrive.

Multiple officers from the Fort Pierce Police Department responded to the scene within minutes of the shooting. Lying face down on the ground, the victim was pronounced dead at the scene. According to the medical examiner, the victim died of multiple gunshot wounds. Seven of the 18 bullets hit the victim and 5 of those 7 wounds were on the victim's lower back, buttocks, and back of his arm. There was a single wound on the side of the victim's face and a single wound on the inside of the right elbow. The medical examiner testified that the gunshot wounds were consistent with the victim turning away and being shot while rotating. He also acknowledged that the wounds were consistent with the victim just twisting and turning while staying in one place.

Appellant testified that he was afraid for his life and Briana's life, and felt that the shooting was justified. He knew that the victim owned a firearm, and believed that the victim went to retrieve it when he went back inside his apartment. He felt like the victim had something in his hands when he ran towards him, but he could not see what it was.

After a stand-your-ground hearing, the trial court entered a written order denying appellant's motion for declaration of immunity and dismissal. The court summarized the pertinent facts presented at the hearing, and concluded that "[t]here was not any credible testimony or evidence presented to support the Defendant's version of the shooting." The court gave great credence to two "uninvolved witnesses" who had "no interest in the case." One of these witnesses said that the victim had no weapon in his hands as he approached appellant in a "power walk" as if ready to continue the fist fight; the other witness indicated there was nothing in the victim's hands when he fell to the ground. They also supported the notion that the victim began to retreat after the first bullet hit him, but appellant kept shooting at the victim's back.

We find no error in the procedure the trial court used to handle the stand-your-ground hearing prior to this court's decision in *Hight v. State*, 253 So. 3d 1137 (Fla. 4th DCA 2018), which held that the 2017 amendment contained in subsection 776.032(4), Florida Statutes (2017), did not apply retroactively. We find no error in the court's denial of appellant's motion to dismiss at the stand-your-ground hearing and the denial of his motion for judgment of acquittal at trial. At the pre-trial hearing, the court resolved conflicts in the evidence adversely to appellant, finding that "there was not any credible testimony or evidence presented to support [appellant's] version of the shooting." At trial, a "motion for judgment of acquittal based upon self defense should not be granted unless 'the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.'"

*Morgan v. State*, 127 So. 3d 708, 717 (Fla. 5th DCA 2013) (quoting *Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974)). Given the conflicts in the testimony, this was clearly a case for resolution by the jury.

*The trial court fundamentally erred by omitting a key word from the standard jury instruction on justifiable use of deadly force*

The standard jury instruction for the justifiable use of deadly force provides, in pertinent part:

> In deciding whether defendant was justified in the use of deadly force, you must judge [him] by the circumstances by which [he] was surrounded at the time the force was used. The danger facing the defendant **need not have been actual**; however, to justify the use of deadly force, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of that force. Based upon appearances, the defendant must have actually believed that the danger was real.

Fla. Std. Jury Instr. (Crim.) 3.6(f) (emphasis added).

According to the transcript in the record, the trial court erroneously instructed the jury that "[t]he danger **need have been actual**" instead of "the danger facing the defendant need not have been actual." Neither the prosecutor nor defense counsel objected to the instruction as given.

Because there was no objection, we must determine whether such error constitutes fundamental error. *See Miller v. State*, 828 So. 2d 445, 447 (Fla. 4th DCA 2002). Appellant correctly points out that the erroneous instruction impacted his sole defense of "self-defense justifiable use of force." "[W]here . . . a trial judge gives an instruction that is an incorrect statement of the law and necessarily misleading to the jury, and the effect of that instruction is to negate the defendant's only defense, it is fundamental error and highly prejudicial to the defendant." *Williams v. State*, 982 So. 2d 1190, 1194 (Fla. 4th DCA 2008) (quoting *Carter v. State*, 469 So. 2d 194, 196 (Fla. 2d DCA 1985)).

The state argues that the error was not fundamental because the parties did not rely on the erroneous instruction during closing argument. We rejected this argument in *Garrido v. State*, 97 So. 3d 291, 295 (Fla. 4th DCA 2012), where we wrote that "[a]s the jury must follow the law as set forth by the trial court, the fact that the prosecutor and defense counsel

correctly state the law during closing does not cure the trial court's reading of an erroneous instruction."

Where fundamental error has occurred, we must reverse and remand for a new trial. If a charge central to a defendant's defense is in error, that error is a fundamental one.

We have spent much time with the transcript and approached this issue with caution because it appears as if there are multiple places in the transcript where words have been omitted. One of those words is the "not" that is not in the transcript of the judge's recitation of standard charge 3.6(f). Neither attorney noticed the omission at trial.

It is possible that the omitted word might have been a problem in transcription, rather than an omission by the experienced trial judge.

The transcript reveals three times during the charge conference that the judge referred to written instructions in a notebook which the jury would have during deliberations. Both attorneys approved the "instructions in the written form." We have scoured the record and do not find that the written instructions given to the jury were marked as an exhibit and included in the record on appeal. If the written instructions were part of the record, and written standard charge 3.6(f) correctly stated the law, we would hold that no fundamental error occurred. It is inconceivable that, without a memory savant, the jury would have recalled a charge where a three letter word was omitted rather than relying upon a hard copy of the charge present in the jury room, where the correct law is set out in black and white. The situation here underlines the importance of including in the record the written collection of instructions on the law that the jury takes into deliberations.

*The state's "expert" witness improperly bolstered the testimony of witnesses favorable to the state*

Both the state and appellant called witnesses they described as "experts." During the stand-your-ground hearing, the defense expert opined that appellant's use of deadly force was justified; the state's witness testified that appellant's use of force was not objectively reasonable under the circumstances. At trial, in a roundabout way, the experts opined about the reasonableness of appellant's use of deadly force. Neither side objected to the other calling an expert, but they agreed that the experts would not refer to the credibility of witnesses.

To ensure that this opinion is not read as tacit approval of this use of expert testimony, we first address the propriety of such testimony in a case such as this. Had there been an objection to either expert, it should have been sustained. The case turned entirely on how the jury evaluated the testimony of various civilian eyewitnesses to the shooting. The experts reviewed witness statements and other evidence in the case, personally interviewed some witnesses, and essentially opined on the issue of whether the use of deadly force was reasonable, and therefore justifiable under the law.

To be admissible, expert testimony must "assist the trier of fact in understanding the evidence or in determining a fact in issue . . . ." § 90.702, Fla. Stat (2017). We have also described this quality of expert testimony as being "helpful to the trier of fact." *Anderson v. State,* 786 So. 2d 6, 8 (Fla. 4th DCA 2000) (quoting *Holiday Inns, Inc. v. Shelburne,* 576 So. 2d 322, 335 (Fla. 4th DCA 1991)). Whether self-defense applies in a given case is a classic question that jurors are well equipped to handle. As we wrote in *Mitchell v. State*:

> In order to be helpful to the trier of fact, expert testimony must concern a subject which is beyond the common understanding of the average person. Expert testimony should be excluded where the facts testified to are of such a nature as not to require any special knowledge or experience in order for the jury to form conclusions from the facts.

965 So. 2d 246, 251 (Fla. 4th DCA 2007) (internal citation omitted). Here, the experts' opinions on the viability of self-defense necessarily involved their estimation of the credibility of the competing witnesses, a determination squarely within the wheelhouse of the jury as the finder of fact.

Because the experts testified without objection, we examine appellant's complaints about the testimony of the state's expert, to which there was an objection. We agree that the state's expert was improperly permitted to comment directly and indirectly on the credibility of witnesses.

The state's expert, a law enforcement officer, described the technique for forming an opinion on the self-defense issue:

> [W]e have to evaluate what the witnesses say. And we evaluate the facts of the case at this point now because . . . we have [Appellant]'s perspective, but we also have multiple witnesses' perspective and we have to kind of filter through all of this.

So how do I evaluate that?  How do I evaluate that when we're evaluating use of force incident?  We start to look at implicit biases and things like that or biases within people and we look at independent witnesses and we look at what are the facts.

* * *

[I]t's all a part of the totality of the circumstances when we look and we evaluate what the witnesses are telling us.  So we have basically like I said, one person that is more leaning towards the decedent, more connection to the decedent, one that has more connections to the Defendant and then we have one that has no connection really to anyone.

The state expert demeaned appellant's credibility concerning whether the victim may have been armed by pointing out "no one says that except for [Appellant]."  He bolstered the credibility of a witness favorable to the state by describing her as a "totally independent witness that has no connection to either party. . . .  One witness is independent in my opinion . . . it just adds more credence to somebody that does not have a connection."  This witness's independence made the location of the victim's hands at a crucial time in the incident "apparent" to the expert.  Concerning a witness who did not testify at trial, the expert described what her testimony would have been and then concluded that it was "consistent with everyone except for the Defendant."  In rendering an opinion that the use of deadly force was not reasonable, the state expert said "we really have to look at what the witnesses say, every single one of them, except for our Defendant, has the hands to the front."

The Florida Supreme Court has squarely condemned the type of credibility bolstering that occurred here.  In *Calloway v. State*, the Court wrote:

[I]t is erroneous to permit a witness to comment on the credibility of another witness because the jury alone determines the credibility of witnesses.  Testimony from a police officer about the credibility of another witness may be particularly harmful because a jury may grant greater credibility to the officer.

210 So. 3d 1160, 1189 (Fla. 2017) (internal citations omitted).  To the same effect, *Tumblin v. State*, focused on the abundant case law holding that a law enforcement officer's testimony about another witness's credibility is especially harmful:

"[A]llowing one witness to offer a personal view on the credibility of a fellow witness is an invasion of the province of the jury to determine a witness's credibility." *Seibert v. State*, 923 So. 2d 460, 472 (Fla.2006) (quoting *Knowles v. State*, 632 So. 2d 62, 65-66 (Fla.1993)). "It is clearly error for one witness to testify as to the credibility of another witness." *Acosta v. State*, 798 So. 2d 809, 810 (Fla. 4th DCA 2001). Moreover, "[i]t is especially harmful for a police witness to give his opinion of a witnesses' [sic] credibility because of the great weight afforded an officer's testimony." *Seibert*, 923 So. 2d at 472 (quoting *Page v. State*, 733 So. 2d 1079, 1081 (Fla. 4th DCA 1999)); *see also Acosta*, 798 So. 2d at 810. "Police officers, by virtue of their positions, rightfully bring with their testimony an air of authority and legitimacy. A jury is inclined to give great weight to their opinions. . . ." *Bowles v. State*, 381 So. 2d 326, 328 (Fla. 5th DCA 1980); *see also Lee v. State*, 873 So. 2d 582, 583 (Fla. 3d DCA 2004) (holding police officer's comment that witness was credible and positive in her pretrial lineup identification was error requiring new trial); *Olsen v. State*, 778 So. 2d 422, 423 (Fla. 5th DCA 2001) ("[I]t is considered especially harmful for a police officer to give his or her opinion of a witness' credibility because of the great weight afforded an officer's testimony."); *cf. Perez v. State*, 595 So. 2d 1096, 1097 (Fla. 3d DCA 1992) (stating that improper admission of police officer's testimony to bolster the credibility of a witness cannot be deemed harmless).

29 So. 3d 1093, 1101-02 (Fla. 2010).

In a case where so much turned on credibility, the *Calloway/Tumblin* error here cannot be said to be harmless.

### *The trial court properly denied appellant's motion for judgment of acquittal of the second degree murder charge*

Finally, we reject appellant's argument that the trial court erred in denying his motion for judgment of acquittal because the evidence was insufficient to prove the ill will required for a conviction of second degree murder.

The crime of second degree murder is defined as "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular

individual, is murder in the second degree . . . ." § 782.04(2), Fla. Stat. (2016). "In the context of second-degree murder, an act . . . evinces a 'depraved mind' if it is an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another; and (2) is done from ill will, hatred, spite or an evil intent; and (3) is of such a nature that the act itself indicates an indifference to human life." *Wiley v. State*, 60 So. 3d 588, 591 (Fla. 4th DCA 2011). "However, 'extremely reckless behavior itself is insufficient from which to infer any malice. Moreover . . . an impulsive overreaction to an attack or injury is itself insufficient to prove ill will, hatred, spite, or evil intent.'" *Id.* (quoting *Light v. State*, 841 So. 2d 623, 626 (Fla. 2d DCA 2003)).

Viewed in the light most favorable to the state, the evidence was sufficient to support a finding that appellant acted with a depraved mind when he shot the victim. Appellant overheard yelling and commotion while on the phone with his girlfriend. He rushed home, sped into the apartment complex, left his car running in the middle of the parking lot, and jumped out to confront the victim, believing that he saw the victim strike his girlfriend when he pulled in. He exchanged angry words with the victim and quickly engaged in a physical "tussle" with him until they were separated. There was time to cool off when the victim retreated to his apartment and appellant went to his car to get his firearm. Appellant's girlfriend tried to keep him from going after the victim, begging him to think of their daughter. When the victim left the apartment, he approached appellant with his hands in front of him and without any weapon. Appellant waited until the victim was within close range before firing all 18 rounds of his gun. Seven of the 18 bullets struck the victim. Five of those seven wounds were located on the victim's back, buttocks, and back of his arm, which indicated that appellant continued to shoot the victim even after he turned away.

We reverse the conviction for second degree murder with a firearm and remand for a new trial.

CONNER and FORST, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***