# DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

**HENRY XAVIER WILSON,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D2025-0250

[April 22, 2026]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; William Loy Roby, Judge; L.T. Case No. 432022CF000918CFAXMX.

Daniel Eisinger, Public Defender, and Ethan Goldberg, Assistant Public Defender, West Palm Beach, for appellant.

James Uthmeier, Attorney General, Tallahassee, and Luke Robert Napodano, Senior Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Henry Wilson was convicted after a jury trial of aggravated assault with a firearm, burglary of a conveyance while armed, and resisting an officer without violence. We write primarily to address one issue: whether statements of public officials concerning the right "to keep and bear arms" under the Second Amendment of the United States Constitution and Article I, Section 8 of the Florida Constitution were admissible at trial to show Wilson's state of mind during the commission of the crimes. We hold that the statements of the public officials were not relevant to any material issue of fact at the trial and affirm the decision of the trial judge to preclude the introduction of such evidence.

### *Factual Background: The Prosecution's Case*

The charges stem from an incident at Wilson's apartment complex, where he confronted a tow-truck driver with a firearm.

Before the incident, Wilson had lived at the apartment complex for eight years. He parked two vehicles at the complex: a Toyota work truck and a 1993 Mitsubishi 3000. The Mitsubishi needed repairs, so it was covered with a nylon cover and had been kept in the parking lot for the entire time Wilson lived at the complex.

The apartment complex's rules for vehicles, included in lease agreements, prohibited covered or inoperable automobiles. Signs posted throughout the community advised that the parking area was a tow-away zone and that Gary's Towing was used to remove vehicles.

A leasing agent conducted regular checks of the buildings and parking lots. She became aware that Wilson owned a vehicle that was not in compliance with community rules.

On September 16, 2022, the leasing agent placed a violation sticker on the driver's side window of the Mitsubishi on top of the cover. The sticker was brightly colored and indicated that the vehicle would be towed on September 21, 2022. She placed a separate parking violation notice on Wilson's work truck, which also had "issues with being in compliance."

On the same day the leasing agent placed the violation sticker on the Mitsubishi, Wilson called the office to request a work order for his dishwasher. During this phone call, the leasing agent mentioned the compliance issues with Wilson's vehicles, and he told her, "Don't worry about it." The leasing agent testified that she told Wilson that his vehicles were subject to being towed, and he hung up on her.

On September 21, 2022, the owner of Gary's Towing and Recovery ("Gary") went to the apartment complex to tow about five or six vehicles. His business had a towing contract with the apartment complex.

Gary wore a bright red shirt with "Gary's Towing" emblazoned on the front and back. He drove a black tow truck displaying his company's name and state license number.

When Gary got to Wilson's car, he pulled the cover up and verified that the car was one he needed to tow. Using the tow truck, he lifted the car in the air, got out of his truck, and came "around the corner to look at the car and take the cover off."

At that point, Wilson ran out of his apartment, gun in hand. Gary told Wilson that the gun was not necessary. Wilson responded with foul language. Gary put his hands up and started backing up. Wilson said,

"[P]ut my fucking car down," and Gary replied, "I can't do that." Gary testified that Wilson pointed the gun at him and threatened to kill him. Gary was in fear for his life. Wilson never asked why Gary was towing his vehicle.

Meanwhile, an upstairs neighbor stepped outside to smoke when he heard arguing. Based on Gary's shirt and truck, the neighbor recognized Gary as a tow-truck driver. The neighbor testified that Wilson had a firearm and was demanding the keys from Gary. Although Wilson was not "aiming at [Gary] as a target," Wilson was waving his hands around in a way that Gary would have been shot if a misfire had occurred. The neighbor saw that Gary was terrified.

The neighbor attempted to pacify Wilson, who was in an aggressive mood. The neighbor intervened to get Wilson's attention so that Gary could hide. The neighbor stood in front of Gary and told Wilson that if he was going to fire, he would hit two people and worsen his charges.

During the confrontation, Gary's tow truck's door was slightly ajar. The keys were in the ignition, and the truck was running. While Wilson still held the firearm in his hand, he went into Gary's truck, reached inside, and grabbed the keys from the ignition. Wilson did not have permission to enter Gary's truck.

After running away, Gary called 911 to report that a "guy's got a gun on me." During the call, Gary could be heard saying "[H]ey, sir, don't get in my car. You better get out of my car." Gary then told the 911 operator that the man had entered the tow truck and had taken the keys.

Officers responded to the 911 call in uniform and in marked patrol cars. An officer observed Wilson near the tow truck with a black firearm in his hand. This officer commanded him to drop the object in his hands, put his hands on his head, walk towards the officer, and get on his knees.

Wilson initially refused to comply with the officers' commands, including the command to put down the gun. Eventually, Wilson put his gun down and got on one knee. Officers then brought Wilson down to the ground with the assistance of a K-9 unit. A pat down search revealed two sets of keys, with one belonging to Gary. Police also secured Wilson's firearm, which was loaded and functional.

3

### Wilson's Trial Testimony

Wilson testified that he did not recall any lease provision about parking violations and that no one had ever told him he could not keep his Mitsubishi covered in the parking lot. He denied seeing a violation tag on the Mitsubishi and claimed that the leasing agent never told him that his vehicle would be towed.

When Wilson looked out his living room window and saw his car elevated on a hook, he assumed someone was stealing his car. He was aware of prior thefts at the apartment complex and did not believe that there was any reason "for them to tow my car." Although he admitted taking his gun to confront Gary, he sanitized his conduct by denying that he threatened Gary or pointed the gun at him.

Wilson claimed that because he had to retrieve his phone from his apartment to call the police, he reached into the open door of the tow truck and grabbed the keys so Gary could not leave with his car. When the police responded, Wilson did not think he had done anything wrong. A back problem made it difficult for him to comply with the officers' instruction to get on his knees.

### Jury Instructions and Verdict

Defense counsel did not object to the jury instructions given and did not request an instruction on the justifiable use of force.

The jury found Wilson guilty as charged on all three counts.

### Pretrial Proceedings Concerning Statements Made by Governor DeSantis and the Martin County Sheriff

The incident in this case occurred several days before Hurricane Ian struck Florida.

In discovery, Wilson listed Governor Ron DeSantis as a witness and disclosed a YouTube video titled "DeSantis Puts Looters On Notice After Hurricane Ian," which depicted a news conference held on September 30, 2022, about one week after the incident. In the video, the Governor says: "Don't even think about looting. . . . [I]n the State of Florida you never know what may be lurking behind somebody's home and I would not want to chance that if I were you, given we're a Second Amendment State."

4

The Governor's office moved to quash a subpoena for his trial testimony and moved for a protective order.

At a hearing on the motion, defense counsel argued that Wilson's intent was a material issue of fact. Defense counsel maintained that Wilson had been "led to believe all along he has a Second Amendment Right to protect himself" and "a right to arm himself even when personal properties [are] at question or at risk of being taken." Defense counsel continued that "it's what many of our citizenry have been led to believe based on statements made by our elected officials and the Governor in particular." According to defense counsel, the video conveyed "the idea that it's certainly alright to arm yourself while defending yourself and/or protecting your personal property," which was relevant to Wilson's mindset and intent at the time of the offense. The Governor's statements were relevant, defense counsel argued, because they came from a higher authority who was in a position "to know what the laws are."

Defense counsel also referenced statements from the Martin County Sheriff to the effect that "anybody here that commits a crime must have taken the wrong exit," as well as general knowledge about people dressing up "in various service industry uniforms" to commit crime and fraud. Wilson's theory of defense was that he believed his car was being stolen and "all he wanted to do was detain that person until law enforcement actually came to sort it out."

The trial court granted the protective order and ruled that Wilson would be precluded from "taking this angle or advancing his case in this particular way."

### *Wilson's Arguments on Appeal*

On appeal, Wilson argues that the trial court erred when it prohibited him from pursuing his theory of defense that his actions were justified because he acted in the defense of property. Emphasizing that an accused has a right to present evidence in his own defense, Wilson argues that his theory of defense went directly to his state of mind at the time of the incident—namely, that he believed his car was being stolen and that he had the right to protect his property with a firearm until the police arrived. Wilson complains that the trial court improperly precluded him from presenting evidence that his actions in the moment occurred "because he was led to believe that Florida is a pro-Second Amendment state and that our elected officials routinely promote the use of firearms for the protection of personal property against theft and looting," which Wilson viewed as "the key ingredient to his defense."

5

### *Discussion*

"A party is entitled to present evidence upon the facts that are relevant to his theory of the case, so long as that theory has support in the law." *Zamora v. State*, 361 So. 2d 776, 779 (Fla. 3d DCA 1978). "Normally under a plea of not guilty an accused may avail himself of any defense not required by law to be specifically pleaded, and all matters of justification and excuse." *Ivory v. State*, 173 So. 2d 759, 760 (Fla. 3d DCA 1965).

Still, while evidence that tends to support the defendant's theory of defense is generally admissible, "it is also true that 'the admissibility of this evidence must be gauged by the same principle of relevancy as any other evidence offered by the defendant.'" *Washington v. State*, 737 So. 2d 1208, 1223 (Fla. 1st DCA 1999) (citation omitted). "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2024). "Relevancy has been defined as a tendency to establish a fact in controversy or to render a proposition in issue more or less probable. To be probable, evidence must be viewed in the light of logic, experience and accepted assumptions concerning human behavior." *Kopsho v. State*, 84 So. 3d 204, 217 (Fla. 2012) (quoting *Zabner v. Howard Johnson's Inc.*, 227 So. 2d 543, 545 (Fla. 4th DCA 1969)).

Wilson did not request a jury instruction on the justifiable use of force in defense of property. Section 776.031, Florida Statutes (2022), establishes the legal parameters for the use of force in the defense of property[1]:

> (1) A person is justified in using or threatening to use force, except deadly force, against another when and to the extent that the person reasonably believes that such conduct is necessary to prevent or terminate the other's trespass on, or other tortious or criminal interference with, either real property other than a dwelling or personal property, lawfully in his or her possession or in the possession of another who is a member of his or her immediate family or household or of a person whose property he or she has a legal duty to protect. A person who uses or threatens to use force in accordance with this subsection does not have a duty to retreat before using or threatening to use such force.

---

[1] Article I, Section 8(a) of the Florida Constitution establishes a "right of the people to keep and bear arms," but also states that "the manner of bearing arms may be regulated by law."

(2) A person is justified in using or threatening to use deadly force only if he or she reasonably believes that such conduct is necessary to prevent the imminent commission of a forcible felony. A person who uses or threatens to use deadly force in accordance with this subsection does not have a duty to retreat and has the right to stand his or her ground if the person using or threatening to use the deadly force is not engaged in a criminal activity and is in a place where he or she has a right to be.

The justifiable use of force has both a subjective and an objective component. "When self-defense has been asserted, the defendant is entitled to have the jury consider the facts and circumstances known to the defendant (i.e., his or her subjective belief), but those facts and circumstances must be balanced against what a reasonable person would believe under the same or similar circumstances, the ultimate test of 'reasonableness' being objective." *Oquendo v. State*, 420 So. 3d 466, 475 (Fla. 2025) (cleaned up).

In *Oquendo*, the Florida Supreme Court held that while "PTSD evidence may be relevant to the subjective component of a defendant's self-defense theory," such evidence was properly excluded in that particular case because the defendant claimed he fired the gun accidentally, and defense counsel's arguments suggested that the central purpose of the PTSD evidence was to show diminished capacity. *Id.* at 469, 477–78.

Relevant to the instant case, the Florida Supreme Court explained that the plain text of the defense-of-person statute "requires both that 'he or she . . . believe[d]' that the use of force was necessary (actual subjective belief of the defendant) and that the belief was 'reasonabl[e]' (objective reasonable person standard)." *Id.* at 475. Thus, the defense-of-property statute, which uses the same "reasonably believes" terminology as the defense-of-person statute, requires both a subjective belief that force was necessary and an objectively reasonable basis for the belief.

Although expert testimony about a defendant's psychological condition might be admissible under *Oquendo* to show the subjective component of self-defense or defense of property, expert opinions about the reasonableness of the defendant's use of force are generally inadmissible because "[w]hether self-defense applies in a given case is a classic question that jurors are well equipped to handle." *Salomon v. State*, 267 So. 3d 25, 31 (Fla. 4th DCA 2019); *see also Mitchell v. State*, 965 So. 2d 246, 251 (Fla. 4th DCA 2007) (affirming exclusion of expert's proffered testimony that,

7

based upon what the defendant told him, the defendant reasonably believed that he had to defend himself, as there was nothing in the expert's testimony "which concerns a subject beyond the common understanding of the average person").

Similarly, in rejecting a claim of fundamental error in jury instructions on self-defense, we once remarked that "juries use their common experience and apply a street version of self defense that allows a defendant to use a reasonable amount of force under the circumstances, and no more." *Farmer v. State*, 975 So. 2d 1275, 1277 (Fla. 4th DCA 2008).

Here, the trial court did not abuse its discretion in excluding evidence of public statements by elected officials offered to show Wilson's state of mind.

First, the Governor's and Sheriff's statements had nothing to do with state of mind elements of the crimes with which Wilson was charged.

Wilson suggests that "he lacked the criminal intent to commit the charged crimes" because "he acted in defense of his property." But this argument conflates two different legal concepts.

On Count I, the intent element required a finding that Wilson intentionally threatened, either by word or act, to do violence to Gary. On Count II, the intent element required a finding that Wilson entered the tow truck with the intent "to commit an offense other than burglary or trespass."

Whether Wilson believed his actions were *justified* in defense of his property is a question distinct from whether the intent element was satisfied as part of the State's prima facie case for Counts I and II. The elected officials' statements were not relevant to whether Wilson had the criminal intent to commit those offenses.

Less reliable than expert opinions on whether a defendant's use of force was reasonable and therefore justifiable, tough talk by politicians about the Second Amendment or the war against crime does not tend to prove either the subjective state of mind of a given defendant or whether the defendant's belief was objectively reasonable.

Such general statements are far removed from the facts confronting a defendant who used force in a way that led to criminal charges. The proffered generalized statements of the public officials did not tend to establish Wilson's subjective belief at the time of the incident that his

conduct was necessary to prevent or terminate a tortious or criminal interference with his personal property. Nor did such statements tend to prove whether that belief was objectively reasonable. A section 776.031 analysis is tied to an evaluation of facts as they existed at the time force was used or threatened.

The admission of the public officials' statements would not have undermined the State's evidence that (1) Wilson knew or should have known that Gary was a lawful tow-truck driver with authority to tow vehicles at the apartment complex, and (2) Wilson had been given notice that his vehicles were subject to being towed. The proffered statements had nothing to do with towing disputes and had no bearing on whether Wilson subjectively or reasonably believed that his actions of confronting a tow-truck driver with a firearm, threatening him with violence, and seizing his keys were necessary to prevent the driver from tortiously or criminally interfering with Wilson's car.

Even though he did not request that the jury be instructed on the justifiable use of force in the defense of property, Wilson essentially presented a justification defense without being tethered to the requirements of section 776.031. The trial court never precluded Wilson from telling the jury that he believed his conduct was justified. He testified that he assumed his car was being stolen and that he did not believe he had done anything wrong when he confronted Gary.

As often happens in justifiable-use-of-force cases, the defense appealed to the jurors' street notion of justifiable defense of property. Under this approach, it was for the jury to decide whether Wilson's belief was genuine and reasonable under the circumstances, a question that jurors were equipped to determine based on their collective common experience.

The trial court did not abuse its discretion in excluding the statements of public officials regarding the Second Amendment and the "wrong exit" notion.

Turning to a sentencing error, we agree with Wilson's point that the trial court's written sentencing order improperly imposed a general sentence of 60 months "[a]s to Count[s] 1, 2." *See Moore v. State,* 352 So. 3d 47, 49 (Fla. 2d DCA 2022) (holding that the trial court imposed an illegal general sentence as to thirty-five counts of grand theft where, "[r]ather than imposing an individual sentence for each grand theft count, the sentencing order imposed a single sentence of forty years listing counts two through thirty-six"); *Holmes v. State,* 100 So. 3d 281, 283 (Fla. 3d DCA 2012) ("[A] trial court may not impose a single general sentence to cover

multiple counts"). The defendant raised this issue in a motion filed under Florida Rule of Criminal Procedure 3.800(b), which the trial court denied. We therefore remand to the circuit court to enter a separate written disposition as to each count, which would conform the written sentence to the court's oral pronouncements.

Finally, we reject the argument that the six-person jury violated the Sixth and Fourteenth Amendments to the United States Constitution. *See Guzman v. State*, 350 So. 3d 72, 73 (Fla. 4th DCA 2022) (holding that six-person juries were constitutionally permissible under U.S. Supreme Court precedent), *rev. denied*, No. SC2022-1597, 2023 WL 3830251 (Fla. June 6, 2023), *cert. denied sub nom., Guzman v. Florida*, 144 S. Ct. 2595 (2024).

For these reasons, we affirm the convictions and sentences, but remand to the circuit court for further proceedings consistent with this opinion.

*Affirmed and remanded.*

CIKLIN and CONNER, JJ., concur.

*        *        *

**Not final until disposition of timely-filed motion for rehearing.**